## Case No. 9,886.

### MOUNT DIABLO MILL & MINING CO. v. CALLISON et al.

[5 Sawy. 439;[1] 9 Morr. Min. Reps. 616.]

Circuit Court, D. Nevada. March 19, 1879.

MINES—VEIN—LODE—LOCATOR OF LEDGE—MINING ACT—CLAIM—WORK ON CLAIM—FORFEITURES.

1. While metalliferous rock in place, not in a fissure, may be found under such conditions within clearly defined boundaries, as to require recognition as a vein or lode, as in Eureka Consol. Min. Co. v. Richmond Min. Co. [Case No. 4,548], a broad metalliferous zone having within its limits true fissure veins plainly bounded, cannot be regarded as a single vein or

---

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

lode, although such zone may itself have boundaries which can be traced.

[Cited in Book v. Justice Min. Co., 58 Fed. 121.]

2. The language of a mining law being, that "the locator of a ledge shall be entitled to hold one hundred feet on each side of his ledge:" *Held*, that by virtue of a location of a certain number of feet along the ledge, without any distinct claim of side ground, the locator was entitled to hold one hundred feet on each side of the ledge so located.

3. Where a locator, in his notice of location, claimed "all the privileges granted by the laws" of the mining district: *Held*, that this was a sufficient claim of the one hundred feet on each side of his ledge granted to a locator by the mining law, admitting such claim to be necessary.

4. Section 3 of the mining act of May 10, 1872 [17 Stat. 91], recognizes as valid, locations of mining claims, made prior to its passage, and while the mining act of 1866 was in force, the surface lines of which included more than one vein or lode, and confirms the locators thereof in the exclusive possession of all the lodes which have their apex within the surface lines of such mining claims.

5. "Mining claim" is the name given to that portion of the public mineral land, which the miner takes up and holds, in accordance with mining laws local and statutory, for mining purposes, and the term includes the vein specifically located, all the surface ground located on each side of it, and all other veins or lodes having their apex inside the surface lines.

6. Work on a claim is work done anywhere upon the surface of it, within its surface lines, or anywhere below the surface, within those lines extended down vertically, and though it should be shown that the work done within the lines below the surface was also within a lode having its apex outside of such vertical surface lines, it will still be work on the claim within the meaning of section 2324 of the United States Revised Statutes.

7. Work done outside of a claim for the purpose of prospecting or developing it, is as available for holding the claim as if done within the boundaries of the claim itself.

[Cited in Book v. Justice Min. Co., 58 Fed. 117; Chambers v. Harrington, 111 U. S. 353, 4 Sup. Ct. 430.]

[Cited in Harrington v. Chambers, 3 Utah, 94, 1 Pac. 371.]

8. The owner of several contiguous claims may form one general system adapted and intended to work them all, and when such is the case work in furtherance of the system is work on all the claims intended to be developed by it.

[Cited in Chambers v. Harrington, 111 U. S. 353, 4 Sup. Ct. 430.]

[Cited in Harrington v. Chambers, 3 Utah, 94, 1 Pac. 371.]

9. Forfeitures are deemed, in law, odious, and must be made clearly apparent before courts will enforce them.

[This was a proceeding by Mount Diablo Mill & Mining Company against J. L. Callison and others.]

Garber & Thornton and Jonas Seely, for plaintiff.

Stewart, Vanclief & Herrin and Lindsey & Dickson, for defendants.

Before SAWYER, Circuit Judge, and HILLYER, District Judge.

BY THE COURT (HILLYER, District Judge). This is an action to recover posses-

sion of a mining claim situated in the Columbus mining district, Esmeralda county, Nevada. The complaint alleges ownership of fourteen hundred feet of a certain quartz lode, called the Dinero lode, seven hundred feet easterly and seven hundred feet westerly from the Dinero location monument, "together with one hundred feet of surface on each side of said fourteen hundred feet of said lode," with all the dips, spurs, etc.; and also all that portion of the Dinero, and of all other lodes or veins, the top or apex of which lies within such surface lines, and end planes drawn north and south through points seven hundred feet east and west from a stake marked "Centre Mount Diablo Claim."

The trial has been by the court, a jury having been waived by a written stipulation of counsel. There has been a somewhat extended oral argument, and, in addition, a very full discussion of all the points in briefs. The point most discussed is as to the lateral boundaries of the Mount Diablo lode; the plaintiff contending that the Mount Diablo, Dinero and Callison, or "Mountain Boy" claims, are all on one and the same vein or lode, and the defendants that the Callison is a lode distinct from every other in that district. By agreement of parties, three scientific mining experts only were examined on each side. For the plaintiff, W. S. Keyes, Carl Davis and Dr. Blatchley are of opinion that the said claims are on one single lode. For the defendants, C. A. Luckhart, Professor W. F. Stewart and Charles F. Hoffman are of opinion that the Callison is a separate lode. All of these experts are men of large and practical experience in mining. Each one has examined the mining region now in question with care, and has, under oath, stated the facts upon which he bases his opinion. If the court is not now fully informed, such result is not due to the failure of the parties on either side to present their case thoroughly, but to the inherent difficulties to be found in the questions brought forward for decision.

We proceed now to a consideration of the first question stated, namely, whether the Mount Diablo and Callison claims are on the same or separate lodes. We find at the point where the claim in controversy is located a metalliferous belt, or zone, or district, extending east and west some two miles in length, the width of which has not, so far as appears in this case, been accurately ascertained. Scattered over this belt or zone, a dark rock stained with iron and manganese is seen, called by all the witnesses croppings. Looking west, from the Mount Diablo claim, the general course of the metalliferous region can be seen marked by these black croppings for about two miles. Along this line a great many claims have been located; in some cases several claims being parallel, or nearly so.

Describing this belt of country at the point where the claim in dispute lies, the experts tell us, that they find on the south of the Peru claim, and perhaps coming into that claim, a rock in place which they call variously, silicious, or stratified, or unaltered clay slate. (The Peru is a claim belonging to the plaintiff which lies immediately south of the Mount Diablo. Then follow, going north, the Mount Diablo, the Dinero, and lastly, the Mountain Boy, which covers on the surface nearly the same ground as the Dinero.)

Going north from the Peru; that is, across the belt, the experts find a rock which the plaintiff's witnesses name clay slate, and which they insist, notwithstanding some alterations in color and texture, extends from the stratified slate on the south to a belt of greenstone found about two hundred feet north of the Callison claim, or some eight hundred feet from the Peru south line. This rock is, according to the plaintiff's experts, for the most part a decomposed clay state. In many places, and especially near ore bodies, it is white, and without signs of stratification; in other places it becomes a hard and highly silicious rock of a dark brown color, also unstratified, but always, in their opinion, clay slate more or less altered and decomposed, and all a part of the Mount Diablo lode. On the other hand, the experts of the defendants name this prevailing rock in the Mount Diablo, Dinero and Callison claims, felsite porphyry and decomposed felsite porphyry; the former being the dark brown, and the latter the white clay slate of the plaintiff's witnesses.

Except in the names they give the rocks, and that they differ as to the presence of feldspar crystals therein, the witnesses on both sides agree in their description of such rocks as to color, texture and position.

The stratified slate on the south is barren, as is the greenstone to the north. Throughout this belt the ore bodies, the pay ores, have occurred quite irregularly, unless we except the Callison ore body, to be considered further on. The main tunnel of the Mount Diablo followed, for two or three hundred feet, a crack or fissure which Mr. Keyes at first took to be the fissure up through which the metals came to impregnate the neighboring rocks; but later concluded was a rent made after the deposition of the metals.

Along the line of this tunnel, for the first two hundred feet, the paying ores of the Mount Diablo have chiefly been found. From a point at the foot of an incline (No. 2) sunk from this tunnel, which point is near the center of the Mount Diablo claim, a drift, called the "connecting drift," has been run north two hundred and thirty feet to the Callison upper incline and ore body. At a distance of one hundred and fifteen feet from the foot of this incline there is encountered in the drift a belt of rock, called, by some of the witnesses, the "black dyke," which is from twenty-two to thirty feet in thickness. By whatever name called, clay, slate or porphyry, it is in every exterior quality presented to the sight or touch a different rock from that

adjoining it on each side. About two hundred and fifty feet east of this, in the "blue drift," run from the foot of incline No. 3, a dyke of similar rock is found at a depth considerably greater than in the connecting drift, and appearing, from its position and physical properties, to be the same black dyke found in the connecting drift. This dyke, the defendants claim, is the hanging wall of the Mount Diablo lode. Assuming it to be continuous between the points exposed in the two drifts, it has a course east and west corresponding to the general course of the ore channels in the Mount Diablo and Callison claims. Going on north in the connecting drift from this dyke, we pass through some decomposed felsite porphyry or slate, some quartz and other rocks, not in place, just under the ravine which runs between the Mount Diablo and the Callison claims, and at ninety feet north of the dyke come to a stratum of dark, hard, flinty rock, which is about six feet thick; lying upon this next comes about fifteen feet of defendants' decomposed felspathic porphyry, or plaintiff's clay slate, which defendants call their foot-wall. Then comes the Callison ore body, from two to six feet thick, followed by a hanging wall of the white decomposed barren rock, extending on one hundred feet or more to belts of porphyry, greenstone and serpentine. From the Mount Diablo tunnel to the "black dyke," assays taken by Mr. Keyes every ten feet show from sixty-four dollars and ten cents, in one place twenty feet north of the tunnel, to three dollars and seventy-seven cents silver.

The black dyke is practically barren, though traces of silver are shown by some assays. The material passed through is none of it "pay ore," but is called "vein matter." From the north side of the dyke to the edge of the Callison foot-wall the assays of Mr. Keyes show from five dollars and sixty-five cents to traces of silver. The Callison foot-wall is entirely barren; except that traces of silver may be found on its outermost edges.

The Callison ore channel has been opened one hundred and seventy-seven feet in depth on its dip, and one hundred and eighty-six feet in length on its course or strike; throughout its whole extent the ore has lain on this barren white clay or porphyry, dipping with regularity to the north at an angle of about forty-five degrees. It is from two to six feet thick, and the hanging wall is this white material, before mentioned, extending on north one hundred feet or more. The ore bodies in the Mount Diablo are bounded by decomposed white rock, similar to the foot and hanging walls of the Callison, though no body so large and regular has been found as that in the Callison.

These are the leading facts, and upon them, though the question is not entirely free from doubt, we are inclined to think, and for the purposes of this decision shall assume, that the Callison is a vein or lode separate

from the Mount Diablo, within the meaning of those words as used in the acts of congress, and as interpreted in the Eureka Case [Case No. 4,548]. In that case it was held that the terms, vein and lode, are applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock.

It was considered in that case that the terms, vein and lode, as used by congress, for reasons there given, could not be restricted, always, to "aggregations of mineral matter in fissures of rocks"—that is to say, to typical fissure veins—but must be so extended as to include any other aggregation of mineral matter containing ores lying within clearly defined boundaries. Such boundaries were found in that case in the quartzite on the south, and the clay-slate on the north. Between those boundaries, however, no others appeared clearly dividing the included rock or vein matter; and it never was intended in that case to hold that every metalliferous zone of country to which boundaries could be found must be regarded as one vein or lode, for this would be to reduce all mining districts to one lode. Moreover, in this case we look in vain for clearly defined boundaries where the plaintiff claims the boundaries to be. Dr. Blatchley, a witness for plaintiff, says that on the south "the line of demarcation between the stratified slate which contains no mineral and that which is not so strongly stratified and does contain mineral (meaning gold and silver) is not very clearly defined." Again he says: "There is no distinct or definite line that can be drawn accurately." Mr. Keyes considers the stratified slate as the boundary between the Peru and a claim southwest of it called the "Stump and Adams." This division line is observable on the surface, but he has seen no boundary of unaltered slate below. Both he and Dr. Blatchley consider the south limit of the lode to be where the "impregnation" ends. To the north, where the greenstone is found, the boundary is still less clearly defined. Dr. Blatchley says the line of demarcation between the greenstone and slate "is not plain and clear, * * * to fix it exactly would be very difficult." Again he says, "they (the divisions) are all very vague and indefinite." Beyond the slate claimed to be the boundary on the south ore has been found, increasing the difficulty of fixing the limits of impregnation in that direction.

Looking, then, at this metalliferous zone as a whole, at the point where the claims in question lie, it is impossible to find clearly defined boundaries. There is, however, such a zone there, and there is, no doubt, a limit beyond which the rocks are not impregnated with silver, which limit is at present not clearly ascertained.

Having such a zone or district, when we find within it fissures like that opened by the Callison, filled with ore, we think we must regard them as veins or lodes. For, while

metalliferous rock in place may be so found within defined boundaries as to require recognition as a lode, although not in a fissure, a broad metalliferous zone cannot be permitted to swallow up, under the name lode, true fissure veins found within its limits. We think the Callison claim must be regarded as being upon such a fissure, and as having unmistakable visible boundaries.

We have been unable to feel the importance of determining whether the prevailing rock in these claims shall be called decomposed clay-slate with the plaintiff, or decomposed felsite porphyry with the defendants. Nor do we regard it as a safe guide, in determining whether there is one lode or more here, that chemical analysis shows these rocks to be composed of the same ingredients. The same test would require us to pronounce plumbago, anthracite coal, and massive diamond to be the same.

In these cases, where visible practical boundaries are the important things, the optical qualities of rocks seem to us a safer guide than chemical analysis. All the witnesses agree that true fissures may exist in this rock, whether slate or porphyry; and, be it what it may, we find at the Callison mine a fissure having foot and hanging walls, dip, strike, and a quite uniform breadth. Judging from exterior appearances, we at once pronounce the brown quartz, the stratified clay-slate, the decomposed material, and the "black dyke," different rocks. To the eye, the foot-wall of the Callison mine with its brown, flinty quartz, and overlying clay, is a plain line of demarcation between it and the country rock south of it. For the purposes of this decision, therefore, as before stated, we shall assume the Callison to be a separate vein or lode.

Assuming the Callison to be a separate lode, still the plaintiff claims it, under the operation of the mining laws of the Columbus district, by virtue of the Dinero location. Section 8 of those laws reads as follows: "Section 8. Each locator or claimant in any ledge in this district shall be entitled to two hundred (200) feet by location, and all the dips, spurs, angles, off-shoots, out-crops, depths, widths, and variations, and all the minerals and other valuables therein contained; and the discoverer and locator of any new ledge or lode, shall be entitled to one claim of two hundred (200) feet additional for discovery. The locator, or locators, of any ledge or lode, shall also be entitled to hold one hundred feet on each side of said ledge or lode, together with all minerals (whether in distinct ledges or otherwise) therein contained."

Under this section the plaintiff contends that when a party locates a given number of feet along a given lode, he holds, by virtue of such location, a hundred feet on each side of his lode, without expressly claiming it in his notice; or, in other words, that when a party becomes a locator, he is entitled to hold in that quality the one hundred feet on each side of his lode. The Dinero notice reads as follows:

"Notice.—Dinero Quartz Claim, One Thousand Four Hundred Feet. We, the undersigned, this seventh day of September, A. D. 1867, locate and claim one thousand four hundred feet (1400) on this Dinero quartz lode, together with all the privileges granted by the laws of this, the Columbus mining district, running seven hundred feet each side of this notice. Signed, A. Hanke, and five others."

Upon the strength of the claim in this notice of all the privileges granted by the district laws, the plaintiff further contends that if the quantity of surface ground claimed must be put in the notice of location, he has substantially and sufficiently complied with the law.

The requirements of the Columbus mining laws in regard to locating claims are, that "each claim located shall have a mound or stake placed thereon, on which shall be marked the name of the company, and the number of feet located and claimed;" and further, that "all notices of location shall contain the names of the locators or claimants." There is nothing requiring a marking out of the surface boundaries on the ground.

The construction placed upon the mining laws by the defendants is, that before a locator becomes entitled to hold this surface ground, he must claim it and give notice of his claim; that the miner cannot hold what he has not claimed, and that it is as essential to locate and claim the surface, and specify the number of feet on each side desired, as the number of feet along the lode. Further, that the claim of "all the privileges," etc., does not help the plaintiff, that claim being too indefinite to be of any validity.

After a careful consideration of the language used by the miners, the circumstances under which, and the condition of the district at the time the laws were made, together with the arguments of counsel, we are constrained to hold that the miners meant by section 8, to say, that when a person had become a locator by putting up his stake or mound, and his notice of the number of feet claimed on the lode, with the name of the company and the names of the locators, such person became, by virtue of such location, invested with a right to hold one hundred feet on each side of the lode he had located.

The language is, "the locator of a ledge shall be entitled to hold one hundred feet on each side of his ledge," not that he may locate that quantity of surface ground. This construction gains force from the language which follows that entitling the locator to one hundred feet on each side of his ledge, viz., "together with all minerals (whether in distinct ledges or otherwise) therein contained." This shows that the one hundred feet were to be held for something more that surface ground for convenience in working the claim. When the miners framed the law, doubts ex-

isted, doubts which have not yet been settled, as to the character of the ore deposits in the Columbus district.

Hence this privilege was intended to secure the locator a reasonable quantity of ground, whether his ore deposit should be called a lode or impregnation, or "otherwise." It was, as we think, a definition of what a location of feet along a lode or supposed lode should embrace.

But if we admit that there ought to be a claim and notice of the surface ground, aside from the location of the lode itself, then we consider the notice in this case to be a good and valid notice of the claim of Hanke and his co-locators to fourteen hundred feet along the Dinero lode, and to one hundred feet on each side of that lode.

If it is necessary to express in terms the number of feet the locator intends to claim on each side of the lode, would it not be equally necessary to claim, in distinct, express terms, all the dips, spurs and angles of the lode, which the mining law gives to the locator? We presume it would not be insisted that the locator should not be permitted to follow the dip of his lode outside his surface lines unless he had expressed his intention to claim that right in terms. Yet the right to dips, spurs, etc., is given by the mining law in the same terms as the right to one hundred feet on each side of the lode.

The object of any notice at all being to guide a subsequent locator, and afford him information as to the extent of the claim of the prior locator, whatever does this fairly and reasonably, should be held a good notice. Great injustice would follow, if, years after a miner had located a claim, and taken possession and worked upon it in good faith, his notice of location were to be subjected to any very nice criticism.

We agree with the defendants, that the locator should make his locations so certain that the miners who follow him may know the extent of his claim, and be able to locate the unoccupied ground without fear that, when they shall have found a paying mine, the theretofore indefinite lines of some prior location may be made to embrace it.

But id certum est quod certum reddi potest. When the miner has stated, as the rules require, the number of feet he claims along the lode on which he has set his stake, and has referred all whom it may concern to the laws of the district, by claiming all the privileges granted by the laws of the district, and those laws, in express terms, entitle each locator to hold one hundred feet on each side of his lode, then the length and breadth of his claim are fixed with reasonable certainty, because, by reading the laws of the district, with the notice referring him to them, the subsequent locator can make certain the exact thing claimed. See Gleeson v. White Mining Co., 13 Nev. 442.

It is true that a locator might, if he desired, take less than the one hundred feet, but in this case, Hanke and his associates did claim all the law allowed. And, after all, is it not the gist of the whole matter, that the miner actually takes possession and goes to work, thus giving publicity to his claim? That was done in this case. Plaintiff and its grantors have been on this ground, claiming it, prospecting and working it for years. The defendants cannot claim to have been misled by the notice in this case, for when they located the Mountain Boy, in February, 1878, they knew it was upon the Dinero claim, but insisted that the Dinero, for lack of the required amount of work upon it, had been forfeited.

Besides all this, in March, 1876, almost two years before the defendants located the Mountain Boy, the plaintiff had made a survey, and staked off the exterior boundaries of what it claimed, beyond all chance of mistake. This was done by placing stakes as follows: One at the center, one at the east, and one at the west end of the center line of the Mount Diablo claim; one three hundred feet north, and one three hundred feet south of both the east and west center stakes, thus plainly marking the center line and the four corners of ground claimed by the plaintiff, under the three locations made by Hanke and his associates. The Mountain Boy claim is almost wholly located within the lines marked by these stakes, and the ore body opened by the Callisons has its apex eighty-seven feet south of plaintiff's north line as thus marked.

We think the plaintiff, under the mining law quoted, became entitled to hold one hundred feet on each side of the Dinero lode, by virtue of the original location, unless, as is further urged by defendants, this section 8 was void for conflict with the act of congress of 1866 (14 Stat. 251). It does not appear to us necessary, at this day, to decide the effect of the act of 1866, upon locations made after its passage, and before the act of 1872. We think it by no means certain that the act of 1866 confined locations so that surface ground could not have been taken up, embracing more than one lode, although it is true that a patent under that act could have issued but for one lode.

For, be this as it may, the act of 1872 (17 Stat 91; Rev. St. § 2322) recognizes locations made prior to its passage, the surface lines of which included more than one vein or lode. The language is: "The locators of all mining locations heretofore made * * * shall have the exclusive right of possession, and enjoyment of all the surface included within the lines of their location, and of all veins, lodes or ledges, the top or apex of which lies inside such surface lines." * * *

It is very clear that this language reaches the case of locators who had located claims while the act of 1866 was in force, the surface lines of which included the tops of more than one lode, and confirms their possession to all the surface, and all the lodes included within their lines. That is the case at bar.

The top or apex of the Callison lode lies within the surface lines of the Dinero, and within forty-seven and a half feet of the location monument which Hanke placed on the Dinero croppings; and it follows that the plaintiff is entitled to the exclusive possession of the Callison lode, unless for non-compliance with the law, a forfeiture of the Dinero claim has been incurred.

The evidence altogether refutes the idea that there was any abandonment in fact, or any intention to abandon the Dinero claim on plaintiff's part. There can be no doubt from the evidence that sufficient work was done on the Dinero claim to hold it down to 1876 and 1877. But however that may be, it is conceded that, under the statute, if sufficient work was done during the year 1877 to hold it, then there was no forfeiture. The whole question, therefore, on this branch of the case, is, whether in the year 1877 one hundred and forty dollars worth of labor was performed, or improvements made on the Dinero claim. If not, the claim was subject to relocation in February, 1878, by defendants, otherwise not.

On this point we find that a road was made during the year 1877 over the surface of the Dinero and Mount Diablo to be used in working the three mines, the Peru, Mount Diablo and Dinero, all at this time owned by the plaintiff, and to reach the Mount Diablo ore dump and the point on the surface of the Dinero, where the winze in the connecting drift would come out when raised as was then proposed. That portion of the labor on this road done on the surface of the Dinero claim was worth from fifty to seventy-five dollars.

A survey was also made to locate the point where the winze, when raised, would come to the surface, a point within the surface lines of the Dinero. In this year, Mr. Sweetapple located for plaintiff a proposed shaft at the point "R" on the Dinero ground, north of the ravine, and beyond the apex of the Callison vein. This projected shaft was to be a two-compartment shaft, and was to be sunk for prospecting the Dinero ground. An advertisement for bids was made, and six or eight were put in. The shaft was not begun in 1877 because, as Mr. Sweetapple testifies, the company being short of funds, decided to postpone sinking it until the following year. All this was done on the surface of the claim; but it does not distinctly appear that the worth of it was so much as one hundred and forty dollars. It is evidence, however, of a continued purpose to hold the Dinero ground, and tends to confirm the claim of plaintiff, that all the work performed in this connection was intended to be applicable to all these three claims.

The plaintiff further shows that in prosecuting work from the main tunnel, which tunnel begins on the Mount Diablo ground, such as drifting and stoping out ore, some three thousand dollars' worth of labor was done during this year within the surface lines of the Dinero, if those lines are dropped perpendicularly down. This, the defendants say, was not, properly speaking, work on the Dinero claim, but within and on the Mount Diablo lode, which, in its downward course has pitched into the Dinero. The plaintiff, on the other hand, also insists that this and all other work was a part of a systematic plan applicable to all their claims.

This presents a question of practical importance for decision, which the consideration of a few additional facts may help us to do correctly. In the year 1867, the grantors of plaintiff Hanke and his associates, located three quartz claims at the point now in question, viz., the Peru, Mount Diablo and Dinero, all lying side by side, with the Mount Diablo in the center, the Dinero being the first location. The surface of each claim was two hundred feet wide. The plaintiff and its predecessors, from that time on, have been in the undisturbed possession of the mining ground covered by these three claims. During the years from 1867 to 1878, when the defendant entered, a large amount of work had been done by the plaintiff in and upon the claims, consisting of tunnels, drifts, winzes, cross-cuts, inclines, ore stopes, and all the labor usual in the development of such a mining claim. Over ninety-four thousand dollars have been expended by the plaintiff on the claims; much the larger portion within the lines of the Mount Diablo claim.

When Hanke located these three claims, he first located the Dinero, putting up a mound on the croppings; then going south, he located next the Mount Diablo, and last the Peru, putting a notice on the croppings of each. The three claims adjoin each other, and the surface area of the three together is just what the law of 1872 permits a locator to take on locating a single lode, unless the mining laws restrict him, namely, three hundred feet on each side of the center of the Mount Diablo claim. The Columbus laws do restrict the locators to one hundred feet on each side of the ledge located. At the time Hanke made his discovery and locations, he found upon the surface of all three claims black iron and manganese croppings. Ignorant of the real character of the ore deposits he believed he had found, and it being impossible, in the absence of developments beneath the surface, to determine whether these croppings were the signs of one lode or more, he made three locations. This he had a right to do. It was no more than any careful miner desiring to secure the fruits of his discovery, would have done. Subsequent explorations have shown that valuable ore deposits exist in each of the claims so located.

The mining law, providing for the peculiar mode in which the metalliferous deposits occur in the Columbus district, gave the locator a right to stick his stake at the point he supposed and claimed his ledge to be, and then entitled him to hold one hundred feet on each side, with all the ores and metals

therein, thereby, in some degree, protecting the locator upon newly-discovered croppings, against his liability to mistake in selecting the spot to place his stake and notice.

These three claims, so located, the plaintiff has held and worked for more than ten years. The main tunnel, starting in the Mount Diablo, bears north until it penetrates the Dinero ground about one hundred and fifty feet. From this tunnel cross-cuts have been run south into the Peru and north into the Dinero, i. e., across the line dividing on the surface the Mount Diablo and Dinero claims.

Sometime in the year 1876 a cross-cut was made, north about forty-three feet towards the Dinero claim, some two hundred feet from the mouth of the main tunnel. From the north end of this cross-cut, an incline was sunk the same year, one hundred and forty-three feet, bringing the foot of the incline more than fifty feet into the Dinero ground. In 1877, drifting and stoping were carried on from and about this incline, and, according to Mr. Sweetapple, and the. fact is not disputed, at least three thousand dollars' worth of this work was done on the Dinero, north of the Mount Diablo north line. A little north of the foot of this incline a cross-cut from the drift running north, was run, in 1877, twelve or fifteen feet west, at a cost of over one hundred and forty-four dollars. This cross-cut is wholly in the Dinero ground as marked on the surface.

This is the substance of the testimony on this point, and upon it we are called upon to decide whether the plaintiff in the year 1877 failed to comply with the conditions, as to labor on the Dinero claim, stated in section 2324 of the Rev. St., thereby leaving that claim open to re-location.

What, then, is a "mining claim," and what is "work on a claim?" It may be answered, to the first part of the inquiry, that a "mining claim," is the name given to that portion of the public mineral lands which the miner, for mining purposes, takes up and holds in accordance with mining laws, local and statutory. It must under the law of congress of 1872 (Rev. St. § 2320), be located upon at least one known vein or lode, but the vein or lode is not the whole claim.

"No claim," says the act, "shall extend more than three hundred feet on each side of the middle of the vein at the surface." A claim may therefore, if there is no restriction in the local rules, be six hundred feet wide, although the known lode to include which such claim is located is not twelve inches in width. The owners of such a mining claim have. in the language of the law, "the exclusive right and enjoyment of all the surface included within the lines of their locations." Rev. St. § 2322.

Applying the law to the case in hand, the Dinero claim consists of a tract of mining ground fourteen hundred feet long and two hundred feet wide. The Mount Diablo Company being the owner of the claim, had, in 1877, the exclusive right of possession to the whole tract, so far as the surface is concerned. Below the surface the possession was subject to such right as was given by statute to the owner of an adjoining claim to follow his lode downward across his line into the Dinero ground. Assuming this definition of a mining claim to be correct, the second branch of our inquiry is easily answered; work on a claim is work done anywhere within the lines upon the surface, and anywhere within those lines below the surface, when they are carried down vertically into the earth.

Had the Dinero ground been owned by another than plaintiff, and had this three thousand dollars' worth of work been done by such other owner at the point where it was in fact done by plaintiff, there could not be, it seems to us, any pretext for claiming a forfeiture against the Dinero owners on the ground that the work done, though on the claim, turned out to be within a lode which had its apex outside the Dinero surface lines. We think the fact that the plaintiff was the owner of both the Mount Diablo and Dinero claim, ought not to deprive it of credit for this work done on the Dinero. It is literally and in fact work done on the Dinero claim. If an outside lode dip into the claim, the work may also be done inside of that lode, but at the same time on the Dinero claim. A mining claim, as we have seen, is not merely the vein or lode, but that with a certain quantity of surface ground. The owner has the exclusive right of possession to such surface, as well as to the veins or lodes cropping out therein.

When the owner of a vein having its top outside the lines of such claim, follows his vein into an adjoining claim, he does so by permission of a positive law, without which he would have no more right to go upon his neighbor's claim below, than upon the surface. It is a sort of easement in, or servitude laid upon, the mining claim adjoining. We therefore conclude that when a miner does the necessary labor, anywhere within his boundaries upon the surface or below it, the condition of the mining law as to labor has been complied with. We cannot hold that he shall make no mistakes; that he is bound to ascertain at the risk of forfeiture, whether he is working on a lode having its apex outside his surface lines. The miner has perils and perplexities enough, without adding this. The ten dollars' worth of labor which the law requires the plaintiff to do on each one hundred feet of the Dinero claim, to save it from forfeiture, is too small to be of any practical consequence as a development of the claim. Congress plainly required this work to be done by way of a continuous, annual assertion, or renewal of the original claim and location, and nothing more. This being so, it would hurt our sense of justice did we feel compelled to say, that one hundred and forty dollars' worth of labor done

on the surface, utterly valueless as a development of the claim, would have saved the claim from forfeiture, and that the three thousand dollars' worth of work done below the surface cannot.

It is also to be remembered that the plaintiff had long been the owner and possessor of these three claims; that the precise limits of the lodes, if more than one, and the nature of the ore deposit was, and may still be said to be, by no means free from doubt. A long tunnel was driven into this ground, a drift off to the south was run to prospect the Peru; on the north side inclines were sunk, and drifts run, some extending into the Dinero, some not. Wherever, in the Peru, Mount Diablo, or Dinero promise of ore appeared, there work was done, and when found the ore was stoped out.

At two different times, the last in 1874, notices were put up, and one of them recorded, notifying all that the work then being done was intended for the development of the three claims. Work done outside of the claim, or outside of any claim, if done for the purpose and as a means of prospecting or developing the claim, as in the case of tunnels, drifts, etc., is as available for holding the claim as if done within the boundaries of the claim itself. One general system may be formed well adapted and intended to work several contiguous claims or lodes, and when such is the case, work in furtherance of the system is work on the claims intended to be developed by it.

A general system of work for the exploration of the whole ground embraced in these three sets of contiguous claims seems to have been carried on by plaintiff. And we think that all work done was a part of that general system, and, as such, applicable to all the claims which had by purchase been concentrated in a single party, the plaintiff. Under the circumstances of this case it would be little short of downright absurdity to require the plaintiff to segregate his work, and proclaim the labor of removing one wheelbarrow full of earth from the common tunnel to be specifically applicable to the Dinero claim; another to the Mount Diablo, and a third to the Peru. The natural and reasonable presumption is that all the work is done as a part of the system, and as such applicable to all the claims.

Finally, when we consider that the plaintiff had, been in unquestioned occupation of all these claims, for over ten years, prior to the entry of defendants, and the amount of labor altogether done on the ground, we have no inclination, and do not deem it our duty to strain for a construction of the law or of the facts upon which to declare a forfeiture. Forfeitures have always been deemed in law odious, and courts have universally insisted upon the forfeiture being made clearly apparent before enforcing it. Equity often interferes to relieve against forfeitures, but never to divest estates by enforcing them.

Our conclusion is that the plaintiff is entitled to the possession of the demanded premises. Judgment must accordingly be entered in favor of plaintiff.