UNITED STATES of America, Plaintiff,

v.

9,947.71 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF CLARK, STATE OF NEVADA, L. R. Harris, et al., Defendants.

Civ. No. 29.

United States District Court
D. Nevada.
July 19, 1963.

John W. Bonner, U. S. Atty., Thomas R. C. Wilson, II, Asst. U. S. Atty., Richard J. Dauber, Sp. Asst. to the U. S. Atty., Reno, Nev., for plaintiff.

Graves & Compton, Las Vegas, Nev., Lonergan & Jordan, San Bernardino, Cal., for Stauffer Chemical Co.

Prince A. Hawkins, Hawkins, Rhoades & Hawkins, Reno, Nev., Edward E. Kallgren, Brobeck, Phleger & Harrison, San Francisco, Cal., for Fibreboard Paper Products Co.

PEIRSON M. HALL, District Judge.

The question to be resolved is whether or not defendants, Fibreboard Paper Products Corporation (Fibreboard), and Stauffer Chemical Co. (Stauffer) had a compensable property interest in a certain road at the time the United States filed its suit in condemnation and secured an order for possession, which was October 12 and 13, 1952, hereafter referred to as the date of "taking". The land taken in condemnation is and has been known as "Lake Mead Base", a military installation.

This memorandum is based on a stipulation of facts, and a supplemental stipulation of facts, as they were clarified by statements of counsel on argument. A map showing the road, the mining claims which it served, and the area taken by the United States in this case was attached to the stipulation, and from it was extracted certain information hereinafter set forth.

Many years prior to the taking, predecessors in interest of both Stauffer and Fibreboard located and maintained valid mining claims for gypsum and other non-metallic substances, under the mining laws of the United States. Some were lode and some were placer. Some of the claims were patented before the "taking", and some since, and there is no question raised in these proceedings as to the validity of the mining claims involved. The Stauffer group claims were known as the Anniversary claims and the Fibreboard claims, as the Lovell claims. All claims were completely surrounded by the Public Domain, and no surface access, either ingress or egress, could be had, except over and across public lands of the United States. The Anniversary

claims are 10 to 15 miles farther from a public highway and railroad than the Lovell claims and were located and worked upon prior, in point of time, to the Lovell claims. In 1921 Stauffer's predecessors built a road about 20 to 25 miles in length across public lands from the Union Pacific Railroad at a point near the S. W. corner of Sec. 15, T. 19, S. R. 62 E., M. D. B. M. southeasterly, through what are now the Lovell claims, to the Anniversary claims in sections 10, 11, 14, 15, and 23, T., 20 S * * * R. 65 E., M. D. B. & M., which is about 6 miles south and 20 miles east from the railroad. This road was constructed through a mountain pass and was meanderingly laid out so as to require a minimum length of haul over the lowest possible grade in the rough mountainous country. The road crossed what is now U.S. Highway 91–93, about 3 miles from the railroad, thus giving access to both the railroad and said Highway. Beginning at said Highway, the road passed through the land taken in this case for Lake Mead Base for a distance of about 7 miles, which is the only portion of the road we are concerned with here.

The Anniversary group (Stauffer) used the entire road in connection with active mining operations on the claims from 1921 to 1928, and thereafter, until the date of "taking" in 1952, used it in connection with annual assessment work, a watchman, intermittent visits by engineers, and the transportation of men, materials, supplies, equipment, machinery and ore incident to such operations.

The Lovell group (Fibreboard) used the portion of the road between its claims and the railroad in connection with active mining operation on the claims from 1939 to 1949, and thereafter, until the date of "taking" in 1952, used it for inspection and maintenance of the mine and annual assessment work, and the transportation of men, materials, supplies, equipment, machinery, and ore incident to such operations.

Such use by both groups involved the use of the portion of the road passing through the area which was taken in the within action.

Stauffer's predecessor in 1924 filed a certificate under the Nevada Statutes (Act of Mar. 8, 1865; NCL Sec. 5448; Sec. 406.020 NRS) for a toll road covering a portion of the road, and in 1939 sold its rights thereunder to Fibreboard's predecessor, who thereupon (1939), filed an eminent domain action to condemn, and secured a judgment of condemnation in the Nevada State Court covering not only all of the road involved in the instant proceedings, but an additional stretch of road beyond the land taken herein sufficient to reach the Lovell claims, but not any portion of the road beyond the Lovell claims which led to the Anniversary claims. The defendants were the County of Clark and several owners of mining claims, all of whom disclaimed. The United States was not a party. It could have appeared. (1911 C.P.A. Sec. 671; NCL, Sec. 9160; NRS Sec. 37.080). Mining was declared to be a public use by the Nevada Statutes of 1887 (NCL, Sec. 4154, NRS 516.010), and, miners were authorized to condemn roads for all mining purposes by Nevada Civil Practice Act of 1911, Sec. 664 (NCL, Sec. 9153; NRS 37.010), as were those who complied with the Nevada Statutes for toll roads (NCL, Sec. 5450; NRS 406.040).

The area taken by the United States in these proceedings is about 12 square miles, and, as above noted, within the perimeter thereof is included approximately the first seven miles of the road which lies easterly from U.S. Highway 91–93. None of the mining claims are included in the instant "taking", nor is any of the road easterly of the "taking" to the mines. Since the date of "taking" the use of the portion of the road within the present "taking" has been denied to both Stauffer and Fibreboard by the United States as well as the public generally. This being the only vehicular surface access to defendants' mining claims such denial has effectively prevented both Stauffer and Fibreboard

from having access to their claims, unless they built new roads over other public lands.

The position of counsel for the government briefly stated is that neither defendant had any right in and to the road which constituted "private property" for which either of them is entitled to "just compensation" under the Fifth Amendment to the Constitution of the United States, for two reasons: (1) the fee title to the land over which the road traversed has always been in the United States and the United States has done nothing, by statutory grant or otherwise to vest a property interest in the road in either defendant, and (2) that any interest which might be adverse to the United States was an interest which constituted the road a *public highway*, and that all *public highways* are specifically excluded from the "taking".

The defendants do not claim they had any right to the fee title of the land, but do assert that the Acts of Congress relating to mining coupled with the acts of the actual construction of the road and its use in the operation of their mining claims, buttressed by their compliance with the Nevada Statutes relating to toll roads and eminent domain proceedings for the road, gave them such right to the use of the road as to amount to a private property right for which they are entitled to just compensation.

Counsel for the parties state that there is a paucity of case authority on the precise question involved.

It is not difficult to perceive that such lack of case authority arises from the sheer logic of the proposition that, when the government granted mining rights on the vast mountainous, and often impassable, areas of the West which were in public domain, accessible only by passing over the public domain, it granted, as a necessary corollary to mining rights, the right not only to pass over the public domain but also a property right to the continued use of such roadway or

trail, once it was established and used for that purpose. To realize the force of the proposition just stated, one need but to raise their eyes, when traveling through the West to see the innumerable roads and trails that lead off, and on, through the public domain, into the wilderness where some prospector has found a stake (or broke his heart) or a homesteader has found the valley of his dreams and laboriously and sometimes at very great expense built a road to conform to the terrain, and which in many instances is the only possible surface access to the property by vehicles required to haul heavy equipment, supplies and machinery.

If the builders of such roads to property surrounded by the public domain had only a right thereto revocable at the will of the government, and had no property right to maintain and use them after the roads were once built, then the rights granted for development and settlement of the public domain, whether for mining, homesteading, townsite, mill sites, lumbering, or other uses, would have been a delusion and a cruel and empty vision, inasmuch as the claim would be lost by loss of access, as well as the investment therein, which in many cases of mines required large sums of money, before a return could be had.

■ Congress did not leave the rights of miners and others to such chance, but passed the Act of July 26, 1866, (14 Stat. 251; [1] which declared in Section 1 thereof (30 U.S.C. § 22) that the mineral lands of the public domain were open to exploration and occupation, subject to regulations as may be prescribed by law and subject also to local customs and rules of miners so far as such may not be in conflict with the laws of the United States. Other sections provided for perfecting title to claims and for sale or patent thereof to the claimant. Section 5 (30 U.S.C. § 43) provided one of the conditions of sale that, "in the absence of necessary legislation by Congress, the

1. It is Hornbook law that the mining laws of the United States should be liberally construed.

local legislature of any State or Territory may provide rules for working mines, involving easements, drainage, and other necessary means to their complete development". Section 8 of the Act (43 U.S.C. § 932) provided that "the right-of-way for the construction of highways over public lands, not reserved for public uses, is hereby granted".

Counsel have not cited, and the Court has not been able to find on independent research, a case involving the right of the holder of the right-of-way to such a highway or road over the public domain to compensation in a condemnation suit by the United States. There is nevertheless a respectable body of authority which supports the position of the defendants.

Two of the authorities should command the respect of the plaintiff, the United States of America, as they are the product of the governmental agency having charge of Public Lands and Mines and mining locations.

The first is 43 C.F.R. 244.57 and 244.58, which read as follows in their pertinent parts:

"Sec. 244.57 *Statutory authority* R.S. 2477 (43 U.S.C. 932), grants rights-of-way for the construction of highways over public lands, not reserved for public uses."

"Sec. 244.58 *Effective date and extent of grant.* (a) Grants of rights-of-way referred to in the preceding section become effective upon the construction or establishment of highways, in accordance with the State laws, over public lands, not reserved for public uses. No application should be filed under R.S. 2477, as no action on the part of the Government is necessary * * *". This principle is in accord with long established case law, as will be seen directly.

The second authority, which should command the respect of the government here, is the decision by the Department of the Interior of the United States of America (Plaintiff here) set forth in the opinion of its acting solicitor on October

20, 1959, (66 I.D. 361) wherein, after reviewing the decisions of the United States General Land Office relating thereto, he pointed out that the United States could not charge a miner for a right-of-way which gave access to his mine inasmuch as having built the road "his right to use it for mining purposes is as evident as his right to mine". The decision also noted that the United States had long ago adopted the policy that work done in the construction of roads for ingress and egress to the mining claims for the purpose of operating such claims was creditable as legitimate annual assessment work required to obtain a patent.

The Land Office decisions cited in the opinion of the solicitor were in conformity with Court opinions which uniformly held that work done on roads for necessary mining purposes were credited towards annual assessment work for the patent.

Doherty v. Morris, (1891) 17 Colo. 105, 28 P. 85, is a case in point. There the court said, (28 P. p. 86):

"We do not hesitate to assert that labor performed by the owner of a mine in constructing a wagon road thereto for the purpose of better developing and operating the same may be treated as a compliance with the law relating to annual assessment work thereon. This view, besides being correct on principle, is also, we think, in accord with the rule laid down in the following cases: St. Louis, etc., Co. v. Kemp, 104 U.S. 636, 11 Morr.Min.Rep. 673 [26 L.Ed. 875]; Mount Diablo Mill, etc., Co. v. Callison, 5 Sawy. 439, 9 Morr.Min.Rep. 616 (Fed. Case No. 9886, Nev. 1879). The opinion in St. Louis, etc., Co. v. Kemp, supra, uses this language [at (104 U.S. p. 655)]: 'Labor and improvements, within the meaning of the statute, are deemed to have been had on a mining claim * * * when the labor is performed or the improvements are made for its development,—that is, to facilitate the extraction of the metals it may contain, —though in fact such labor and improve-

ments may * * * be at a distance from the claim itself.' And in Mt. Diablo Mill, etc., Co. v. Callison, supra, it is declared that 'work done outside of the claim, * * * if done for the purpose and as a means of prospecting or developing the claim, * * * is as available for holding the claim as if done within the boundaries of the claim itself.' "

The same principle was applied by the Supreme Court of the State of Washington, in Sexton v. Washington Min. & Mill. Co. (1909), 55 Wash. 380, 104 P. 614, in connection with the building of a road. The Court cited with approval Doherty v. Morris, supra, in support of the proposition that independent of the State Statute, "there could be little doubt but that the performance of this labor in the construction of a road aiding in the general development of the combined properties would be a full compliance with the statutory requirement as to assessment work." The Court also held that even though the parties did not comply with a Washington Statute permitting road building in accordance with rules adopted by an "organized" mining district that, " * * * the building and construction of roads which can and are intended to be used in the general development of the mining property is a doing of assessment and improvement work within the meaning of the law". (104 P. p. 616). The Court further stated (104 P. p. 615) "the courts have uniformly held that any work done upon a claim, or outside of any claim, if done for the purpose of furthering the development of such claim, is permissible and available as assessment work, as if done within the boundaries of the claim itself. St. Louis, etc., Co. v. Kemp, 104 U.S. 636, 26 L.Ed. 875; Mt. Diablo, etc., Co. v. Callison, 5 Sawy. 439, Fed.Cas.No.9,-886 (U.S.C.C.D. of Nev.1879); Book v. Justice Mining Co. [(C.C.D.Nev.1893)] 58 Fed. 106".

The rule that *road work* to the claims was sufficient to satisfy the requirement of annual assessment work is followed in California. Ring v. United States

Gypsum (1923) 62 Cal.App. 87, 216 P. 409; Lind v. Baker (1939) 31 Cal.App. 2d 631, 88 P.2d 777; Pepperdine et al. v. Keys et al., (1961) 198 Cal.App.2d 25, 17 Cal.Rptr. 709.

The same rule is followed in New Mexico; Pinkerton v. Moore (1959) 66 N.M. 11, 340 P.2d 844–846.

In Hall v. Kearny (1893) 18 Colo. 505, 33 P. 373, the Colorado Supreme Court on the authority of Doherty v. Morris, supra, and St. Louis, etc., Co. v. Kemp (1881) 104 U.S. 636, 26 L.Ed. 875 sustained the proposition that work done on a tunnel outside a mining claim was sufficient to satisfy the requirements of the United States laws for annual assessment work. The Court further held that it was immaterial whether or not such tunnel work was done on patented (private) property or unpatented (public) property. To the same effect in Sherlock v. Leighton (1901) 9 Wyo. 297, 63 P. 580–581, 63 P. 934.

The opinion in neither case mentions the Act of February 11, 1875, 18 Stat. 315, (now the last paragraph of 30 U.S.C. § 28), which permitted work done on tunnels to count as work done on mining claims if done for the purpose of developing the mine. That statute is silent as to whether or not the tunnel work on other than mining claims could be credited on the statutory assessment work, thus leaving the determination of that question to the courts, which have uniformly followed the rule that such work off the claims would satisfy the annual assessment work.

Nevada Expl. & Min. Co. v. Spriggs (1912) 41 Utah 171, 124 P. 770, involved the sinking of a shaft for mining purposes which, it was contended "was too far distant" from the mining claims involved to count as assessment work toward holding the claims or obtaining a patent. Here again the Court rested its conclusion on Doherty v. Morris, supra, and held that if the location of the ore bodies in place was known, work done other than upon the claims would be counted as annual assessment work if the purpose of the work was to facilitate

the extraction of the ores and minerals. The Court construed the statement in Chambers v. Harrington (1884) 111 U.S. 350, at 353, 4 S.Ct. 428, at 430, 28 L.Ed. 452, that such work off the claims must be in accordance with a "general system" to mean that the work "as it is commenced on the ground, is such that, if continued, will lead to a discovery and development of the veins or ore bodies that are supposed to be in the claims", and that the term did not mean any fixed plan or specification as to how the work should be done.

Numerous other cases throughout the West have applied and followed the principles set forth in the above case and it would be a work of supererogation to burden this memorandum with their citations and analysis. No cases to the contrary have been found or cited.

■ By Sections 5 and 6 of the Act of May 10, 1872, 17 Stats. 92 (now 30 U.S.C. §§ 28 and 29), a minimum of one hundred dollars worth of work was required to be done each year and a minimum of five hundred dollars was required to secure a patent to a mining claim.

It follows by simple logic that, if the work done on making a roadway to a mining claim could be allowed as annual assessment work to the value of at least one hundred dollars, or a total of five hundred dollars on the mining claim, then the road or right-of-way had some value, and was property.

But there are other authoritative cases which bear upon the proposition as to whether or not such a right-of-way is property and when it becomes such.

In Estes Park Toll-Road Co. v. Edwards (1893) 3 Colo.App. 74, 32 P. 549, the appellant was resisting the efforts of the county to collect a tax on the right-of-way of the toll-road it had built for a distance of fourteen miles on public land, and had operated the same since its construction in 1876, contending that thus it could not be taxed for much the same reasons as advanced here by the United States, viz: that the road was across public lands and the only grant of 43 U.S.C. § 932 was to the public, and that the title to the ground occupied by the roadbed was in the United States, and that hence the roadbed could not be taxed. The court disagreed with the appellant. It pointed out that, "The language used in regard to the right of way for highways (in 43 U.S.C. 932) is 'Is hereby granted.' The word 'grant,' in such connection, is very significant; in fact, seems to be a key for the solution of the question involved. 'Grant:' * * 'A generic term, applicable to all transfers of real property' * * *. It is stipulated that in the year 1876 the grant was accepted, the road constructed, and has since been maintained. This grant and the acceptance were all that was necessary to pass the government title to the right of way, and vest it in the grantee permanently, subject to defeasance in case of abandonment. See [Flint & P. M. Railroad Co. v. Gordon, 41 Mich. 420, 2 N.W.Rep. 648. After entry and appropriation of the right of way granted, and the proper designation of it, the way so appropriated ceased to be a portion of the public domain, was withdrawn from it; and the lands through which it passed were disposed of subject to the right of the road company, such right being reserved in the grant. The road company, as shown, became the owner of the right of way. By the use of its money it improved this right of way, making a highway over which the public could pass by the payment of tolls. Although the public became entitled to use the road, such right was only by compliance with the fixed regulations recognizing the ownership * * * it is clear that the road company could maintain trespass or other actions for any unwarranted interference with its possession and rights. * * * It is also clear that the company had such title as could be sold and transferred, and the successor invested with the right of possession. * * * Tested by these well-settled principles, it will readily be seen that the contention of plaintiff that it had no tangible, taxable property in

the road cannot be sustained. It had its granted right of way, together with its road, for the use of which it exacted dues. A toll road is very analogous to a railway to which congress grants the right of way over the public domain. * * * The fact that the county commissioners had supervisory control to regulate tolls can have no bearing whatever. * * * The right to so regulate * * * neither divests, defines, nor modifies ownership."

In Flint etc. v. Gordon (1879) 41 Mich. 420, 2 N.W. 648, referred to in the above opinion, the Court held that the rights of the railroad flowed from the Act of July 26, 1866 (43 U.S.C. § 932), instead of from the Acts relating especially to railroads. It said (2 N.W. pp. 655–656):

"To acquire the benefit tendered by the act of 1866 nothing more was necessary than for the road to be constructed. No patent is required in such cases; but the offer and acceptance taken together are equivalent to a grant. The complainant, (Railroad) therefore, by accepting the offer of the government, obtained a grant of the right of way which was at least perfectly good as against the government * * * complainant could have been under no obligation to proceed to an appropriation of the interest of the United States, if that interest was freely granted by that act of 1866 (43 U.S.C. 932), as we think it was. Complainant accepted the offer of that act, and the construction of its road under the offer would be not only a sufficient but also an equitable consideration. And when the right was thus perfected we do not think it could have been defeated by any act or relation springing from the accomplishment of something subsequently." [1a]

It is thus apparent that defendants' right-of-way here is similar to the rights-of-way of railroads. It was said in Western Union etc. v. Pennsylvania etc. (1904) 195 U.S. 540, 570, 25 S.Ct. 133, 49 L.Ed. 312, that "A railroad's right of way has, therefore, the substantiality of the fee, and it is private property even to the public in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part except upon the payment of compensation. In other words, it is entitled to the protection of the Constitution, and in the precise manner in which protection is given.[2] It can only be taken by the exercise of the powers of eminent domain * * *."

In Smith v. Mitchell (1899) 21 Wash. 536, 58 P. 667, at 668, the Court states:

"The act of congress (43 U.S.C. 932— then R. S. 2477) * * * does not make any distinction as to the methods recognized by law for the establishment of a highway. It is an unequivocal grant of right of way for highways over public lands, without any limitation as to the method for their establishment, and hence a highway may be established across or upon such public lands in any of the ways recognized by the law of the state in which such lands are located; * * *. Any other conclusion would occasion serious public inconvenience."

From the foregoing the Court concludes, that, the terms of Section 8 of the Act of July 26, 1866 (14 Stat. 251 et seq., 43 U.S.C. § 932) was a grant *in praesenti*, which became effective upon the construction of the road in 1921; that, at that time the title of the United States to the right-of-way passed from the United States and vested in the defendants' predecessors and ceased to be a portion of the public domain, without any further action by either or by any public authority; that, any subsequent disposition of the fee title of the land over which it passed was subject to such right-of-way; that, there were no local laws of Nevada pertaining to the building of roads over public domain for mining purposes, at the time such road was built, and that being so, it cannot be said that the predecessors of the defendants failed

---

1a. To the same effect see: Oregon Short Line R. R. Co. v. Murray City (1954) 2 Utah 2d 427, 277 P.2d 798 and cases there cited.

2. Quoted with approval in Donovan v. Pennsylvania Co. (1905) 199 U.S. 279, at 294, 26 S.Ct. 91, at 94, 50 L.Ed. 192.

to comply with any local custom or local law; that, it was common custom throughout the mining regions in Nevada to build roads over the most easily traversed public domain for mining purposes (a fact of which the Court takes judicial notice), and that the building of the road by defendants' predecessors was in accord with that custom; that, the toll road proceedings and the eminent domain proceedings by defendants' predecessors did not diminish the rights of defendants to the right-of-way so far as the United States is concerned, if anything, their rights were enhanced thereby as being in compliance with the State law to protect their easement under 30 U.S.C. § 43,[3] that, the right-of-way was taxable under Nevada law; (Act of March 23, 1891, Nev.Stats.1891, 135, NCL 6418, 6419);[4] and that, that the money expended in building it was applicable toward the work required to be done for the development of the claim before a patent could issue.

The government nevertheless contends, without conceding that defendants had any rights at all, that if they did have any rights to the road they were not "taken" in this proceeding, because such road was a "public" road or highway which was excepted in the "taking".

The language of the complaint is: " * * * all outstanding right, title and interest of any and all persons claiming any interest whatsoever in the land, subject, however, to existing easements for public roads and highways, public utilities, railroads and pipelines".

■ What constitutes a public road or highway has been the subject of so many conflicting opinions of so many different courts that authority could be found to support any conclusion.[5] In such a situation the Court will look to the common sense of the transaction and to the acts of the parties and public authorities in connection with the matter.

■ In doing so here, we find that the United States has taken absolute possession of the road, excluding not only the defendants but all other persons and members of the public from its use. Thus, the plaintiff, by such conduct, clearly indicated the road was not a public highway and was included and not excluded from the "taking". That the military department of the government is in possession of the land and executes such exclusion, makes no difference, as the military are not a separate government, but part of the same government which is a party plaintiff in this case, viz: The United States of America. Citizens are not to be trapped between one department of the government, which says one thing, and another department of the government, which not only says the opposite but takes the rights of a citizen in the bargain.

■ There are other cogent reasons why the road was not a public highway or public road and was not excluded from the "taking". Section 5356 Nevada Compiled Statutes provided that a board of county highway commissioners was created in each of the several counties of the State; and Section 5358, thereof, prescribed their powers and duties, among which was *"the exclusive control of all matters pertaining to the construction, repairing and maintaining of pub-*

3. Sec. 43. "As a condition of sale, in the absence of necessary legislation by Congress, the local legislature of any State or Territory may provide rules for working mines, involving easements, drainage, and other necessary means to their complete development; and those conditions shall be fully expressed in the patent." R.S. Sec. 2338.

4. 6418. "All *property* of every kind and nature whatsoever, within this state, shall be subject to taxation", (certain exceptions were made which did not cover the instant matter).

"§ 6419. The term 'real estate,' when used in this act, shall be deemed and taken to mean and include, and it is hereby declared to mean and include all * * * *toll roads* * * * or *other improvements*, built or erected upon *any land, whether such and be* private property, or *property* of the state or *of the United States* * * *."* (Emphasis supplied)

5. See 35 Words & Phrases, Permanent Edition, 1963, "Public Highway," p. 184 et seq.

*lic highways, roads and bridges within its county."* To construct, maintain or repair a road by a county requires money from the public funds, and obviously Clark County did not want to assume that obligation in connection with this road, as it filed a disclaimer in 1939, in the State Court proceedings of eminent domain. And, as if to add an exclamation point to that disclaimer, Clark County filed a disclaimer in the instant proceedings, to which it was specifically named as a party defendant. Thus the public authority, whose duty it was to construct, maintain, and repair "public" roads, did not consider it a publc road or highway, and under the law of Nevada it was not a public road or public highway, regardless of any right any individual member of the public may have had to use it in passing over the public domain, with or without the payment of a toll, or with or without the permission of the defendants after the eminent domain proceedings in 1939. Under the above quoted statutes of Nevada the mere right to the use of a road by members of the public, without the assumption by the County of the "exclusive control" thereof, did not make the road, which by stipulation of facts was constructed and maintained by the defendants, a "public" road or "public" highway. It is concluded that the road was not a "public" road or highway and that it was included in the "taking".

Even though others may have used the road, with or without the right to do so, the defendants' right to its use was nevertheless "property" taken from them herein for which they are entitled to "just compensation". United States v. Welch (1910) 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787; Schiefelbein v. United States (C.C.A. 8th 1942) 124 F.2d 945; Brooklyn etc. v. City of New York (C.C.A. 2nd 1944) 139 F.2d 1007, 1011, 152 A.L.R. 296.

In view of the foregoing, it is unnecessary to enter into any extended discussion of the cases cited by the parties, as this Court is satisfied, and holds, that the defendants had a legal and valid right-of-way in and to the road passing through the land taken as the Lake Mead Base which was "property" and which was taken by the United States in this condemnation action and requires the payment of "just compensation" by the plaintiff in accord with the Fifth Amendment of the Constitution of the United States.

 Counsel for the government stated that the Court may wish to certify the decision reached herein for appeal under 28 U.S.C. § 1292(b). The Court declines to make such certification. The condemnation proceedings were filed eleven years ago and the calendars of this Court are such that it appears an early trial can be had on the merits so that a final decision should not be delayed for the additional time it would take for an interim appeal under the above section.

The matter is set for pre-trial on July 29, 1963, at 10:00 A.M. at Carson City. If that date and hour conflicts with the calendars of counsel, they may agree upon a date as near thereto as possible by stipulation with the approval of the Court.