## WATERLOO MIN. CO. v. DOE et al.

(Circuit Court of Appeals, Ninth Circuit.   June 7, 1897.)

### No. 145.

1. **Equity Jurisdiction—Appeal—Waiver of Objections.**
   In a suit to enjoin a continuing trespass by taking ore from a mine, the title to which is in dispute, an appellate court will consider as waived the objection that complainant was bound to establish his title at law before a decree for equitable relief could be granted, when such objection was not taken in the court below.

2. **Mines and Mining—Patented Claims—Extralateral Rights.**
   When a patent describes a claim as having parallel end lines, and grants extralateral rights, the courts are bound by the terms thereof, in a controversy with the owners of an adjoining claim, and cannot deny such extralateral rights on the theory that the end lines are not in fact parallel.

3. **Appeals in Equity—Findings of Fact.**
   On an appeal in equity, findings of fact made by the court below are entitled to some weight, but are not binding on the appellate court. The whole case is before the latter court, and it is bound to decide the same, so far as it is in a condition to be decided, on its merits.

4. **Mines and Mining—Lodes and Veins.**
   Where two veins or ore bodies, lying near together in country rock of liparite, each had clearly-defined foot and hanging walls, with the usual

characteristics of lodes or veins, *held*, on the evidence, that they were separate lodes or veins, and could not be considered as constituting, with the mass of liparite between them, a single mineralized zone or lode, though the intervening liparite was more broken up than that lying outside, and to some extent impregnated with silver.

5. SAME—EXTRALATERAL RIGHTS.

   If the apex of a vein, or part of it, crosses the end line of a claim, and then passes out through a side line, but curves back again into the claim and crosses its other end line, this gives the owners of the claim no right to any part of the apex which is outside of their lines.

Appeal from the Circuit Court of the United States for the Southern District of California.

A. H. Rickets and Geo. H. Noyes, for appellant.
John Garber, for appellees.

Before GILBERT, Circuit Judge, and KNOWLES and BELLINGER, District Judges.

KNOWLES, District Judge. This is an action brought by John S. Doe to restrain and enjoin the appellant from committing a continuing trespass upon two mining claims, known as the "Oriental No. 2" and the "Red Cloud," situate in Calico mining district, San Bernardino county, Cal. John S. Doe died, and the appellees, Bartlett Doe and Charles F. Doe, were appointed executors of his last will and testament, and were substituted as parties plaintiff in the place of the said John S. Doe. The appellant, the Waterloo Mining Company, owns the Silver King mining claim. This lies north of and adjoining the said Oriental No. 2 and Red Cloud claims. The appellant sunk a shaft or incline upon its own surface ground within the lines of its claim, and from thence drifted into the ground claimed by appellees, and which ground is beneath the surface of that which is within the line of appellees' claims. This the appellant claims the right to do, and threatens and undoubtedly intends to continue to do, and to extract the ore therein and appropriate the same to its own use. There is a vein of spar, carrying silver and other minerals, in the Silver King lode claim, called the "north vein," and another sometimes called a "divergent vein," and at other times the "middle vein." There is a vein of spar, also carrying silver, which crops out on the Red Cloud and Oriental No. 2, and which in the evidence is termed the "south vein." Appellant claims that all these veins belong to a mineralized zone whose apex is in the Silver King ground. The Silver King is higher up the mountain than the Red Cloud and Oriental No. 2 claims, and hence upon a higher elevation than the other two. If the ground embracing these three veins is one mineral zone, then the part thereof within the Silver King premises would have the higher elevation. This zone would, however, be cut by the south side line of the Silver King and the north side lines of the Red Cloud and Oriental No. 2. Appellant received pending this suit a patent from the United States to the Silver King lode. The appellees have certificates of sale from the United States for their two claims.

Before proceeding to discuss the questions involving more or less

the merits of this controversy, one of a preliminary nature is presented for determination, and one involving the jurisdiction of the lower court to hear and enter a decree in the same.    It is urged that the circuit court and that this court, in accordance with the established rules in equitable proceedings, had no right or jurisdiction to enter any decree in this case.    The ground upon which this claim is based is that the bill of complaint does not present an equitable cause, for the reason that it does not appear that the title of the complainants to the premises described in their bill, and upon which it is alleged appellant has trespassed, has ever been established by any action at law, and that the title complainants alleged to be in them was controverted and denied in the answer of appellant. Hence one of the issues in the case involved the determination as to the legal title to complainants' alleged mining claims; that under such issues the action was more in the nature of an action of ejectment to try a legal title than one to determine equitable rights.    It does not appear to be controverted but that appellant by its answer put in issue the legal title complainants allege in the bill to be in them. There is no doubt but this is an action asking for equitable relief. Enough is stated in the bill to have warranted the issuing of an injunction pendente lite, had an action at law existed to recover possession of said premises within the boundaries of appellees' mining claims, or in an action in trespass.    The prayer in the bill is for an injunction pending this action, and also that at the determination of this action said injunction be made perpetual.    There is no dispute in the case upon the point that appellant has entered upon premises beneath the surface of the two claims set forth in the bill as the property of appellees.    While the answer to the bill presents an issue as to the title of appellees to their two claims, there was no controversy in the evidence upon this point.    The point presented in this case upon this matter in this court was not presented or considered in the court below.    In the case of Erhardt v. Boaro, 113 U. S. 537, 538, 5 Sup. Ct. 565, 566, the supreme court, having stated that the former doctrine was that when there was a dispute as to title no injunction would be granted restraining a trespass, said:

"This doctrine has been greatly modified in modern times, and it is now a common practice, in causes where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate, such as extracting ores from a mine, or the cutting down of timber, or the removal of coal, to issue an injunction, though the title to the premises be in litigation. The authority of the court is exercised in such cases, through its preventive writ, to preserve the property pending legal proceedings for the determination of the title."

Where there is no dispute as to title, there would seem to be no necessity of resorting to an action at law for the purpose of determining the same.    But, when there is a dispute as to the legal title, it would seem that the best rule was to require an action at law to settle the legal title.    This was so stated in the case of St. Louis Mining & Milling Co. v. Montana Mining Co., 58 Fed. 129.    Pending this action, however, an injunction pendente lite would be proper. When the legal title is settled, if the equitable rights such as would

warrant a perpetual injunction should be found for complainants, then such an injunction should be awarded. The allegations in the bill were sufficient to warrant the court in issuing, not only a temporary injunction in this case, pending an action at law to determine the legal title, but also were sufficient to warrant a perpetual injunction upon the determination of the legal title in favor of the complainants. The question is then presented as to whether or not the appellant could waive this right to have the legal title established at law before there was any consideration of the issues that presented the question as to whether a permanent injunction should issue. If the fact that the legal title has not been determined is one of such vital importance to the jurisdiction of the court that when it exists no jurisdiction to hear and determine such a case as this can be properly exercised, then, upon the motion of appellant, or perhaps upon the court's own motion, the cause should be dismissed. In the discussion of this question, Mr. Pomeroy, in his work on Equity Jurisprudence, says:

"Where, however, the plaintiff's title is disputed, the rule is settled that he must, in general, procure his title to be satisfactorily determined, by at least one verdict in his own favor, by at least one successful trial at law, before a court of equity will interfere; but the rule no longer requires any particular number of actions or trials. The reason for this requisite is that courts of equity will not in general try disputed legal titles to land. But the rule is one of expediency and policy, rather than an essential condition and basis of the equitable jurisdiction."

Here, it is to be observed, the view set forth, that the doctrine that a court of equity will not, 'in such a case as this, proceed to determine the issues presented until the legal title, if controverted, is established in an action at law, is one having its foundation in expediency and policy, and not because a court of equity, as a matter of fact, has no jurisdiction to determine a cause where a legal title is disputed and is one of the issues presented for determination. The same author, in volume 1, p. 130, of said work, says, in speaking of the jurisdiction of a court of equity:

"On the contrary, as will be more fully stated hereafter, the objection that the case does not come within this so-called equity jurisdiction must ordinarily be definitely raised by the defendant at the commencement of the action, or else it will be regarded as waived, and the judgment will not even be erroneous."

In Modern Equity Practice, by Beach, sections 13 and 14 are as follows:

"Sec. 13. The objection that plaintiff has an adequate remedy at law should be raised by demurrer or by plea, or should be distinctly stated in the answer of the defendant. It comes too late at a hearing on the merits, when the court has jurisdiction of the parties and the subject-matter.

"Sec. 14. But when the case is one in which it is not competent for the court to grant the only relief asked, the remedy being at law, or it appears that chancery has not, under any circumstances, jurisdiction of the subject of the bill, the court will entertain the objection at any stage of the case, or sua sponte, and dismiss the bill."

I am of the opinion that these two sections state the correct position. As has been stated before, the relief asked in this case was equitable, and such as a court of law could not afford. An action of trespass, in which damages only could be recovered, cannot be considered

as a substitute for an action which asks that a continuing trespass be prevented, and which trespass goes to the destruction of the estate of the plaintiff. In a case where equitable relief is demanded, the fact that there is a plain, speedy, and adequate remedy at law should be raised in the trial court, or it will be deemed waived. Reynes v. Dumont, 130 U. S. 354–395, 9 Sup. Ct. 486; Kilbourn v. Sunderland, 130 U. S. 505–514, 9 Sup. Ct. 594; Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340; Brown v. Iron Co., 134 U. S. 539, 10 Sup. Ct. 604; Iron Co. v. Reymert, 45 N. Y. 703. The case at bar was not one in which there was any plain, speedy, and adequate remedy at law, but one that courts of equity, when the objection has been properly presented, would not proceed and determine, as a matter of policy and expediency, until the legal title in dispute had been determined in an action at law. But the rule of waiver applied to the former class of cases should be more readily and unreservedly applied in the latter class of cases. For these reasons we hold that the appellees waived the objection that the issue as to the legal title of appellees had not been determined in an action at law before the court below entered the decree in this cause.

Counsel for appellees urge that whatever the court might find as to the south vein being a part of a mineralized zone having its apex in the Silver King lode, the premises of appellant, still appellant would have no right to follow such lode on its downward course outside the side lines of said Silver King lode, because the location of the same was not made according to law, in this: that its end lines were not located parallel with each other. It has been observed that the appellant has a patent from the United States for its said lode. Its rights must be determined by the terms of this patent. The description in the patent of the Silver King lode gives it parallel end lines, and grants the right to follow all lodes on their dip outside of the side lines of the same, whose apex is within the surface lines of the claim, and whose strike is cut by the end lines of the claim extended perpendicularly downward. It is true, perhaps, that in the section of the mineral land act providing for the issuing of patents by the United States for lode claims there is no provision made for granting any extralateral rights. The language of section 2325, Rev. St., is:

"A patent for any land claimed and located for valuable deposits may be obtained in the following manner."

In section 2319, Rev. St., it is, however, provided:

"All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase."

It will be observed that the valuable mineral deposits above named are declared to be open to purchase, and that they are distinguished from the land in which they are found. In section 2322, Rev. St., it will be observed that a lode, vein, or ledge containing a valuable mineral deposit is distinguished from the ground in which the same is found. The grant in this section is:

"Shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their location, and of all veins, lodes and

82 F.—4

ledges throughout their entire depth, the top or apex of which lies inside of such surface lines, extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside of the vertical side lines of such surface location."

Then follow the limitations of the grant, which it is not necessary to quote for a determination of the question now presented for consideration.

It will be observed that the lodes, veins, or ledges granted are distinguished from the surface ground, and are made the subject of a separate grant, and to separate provisions. It may be that congress, considering the provisions of the common law which reserved in every grant from the crown all precious metals, wished to set this matter at rest in these provisions. When we come to the patent for mineral land again, we again observe that the land in which the vein, lode, or ledge is found is treated separately from that of said veins or lodes. Since the passage of the mineral act of 1872, the land department of the United States has given such an interpretation to the same as would allow of a patent to the locator of mineral lands for a lode claim; granting to him, not only the ground within the surface lines of his location, but also all lodes, veins, or ledges having their top or apex within the same, throughout their entire depth, although they might, on their dip extending downward into the earth, depart from the side lines of the ground granted. There was a limitation upon this right, which was described in the following language in the patent:

"Provided, that the right of possession to such outside parts of said veins, lodes or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward through the end lines of said lot (naming the same) so continued in their own direction that such planes will intersect such exterior parts of said veins, lodes or ledges; and provided further, that nothing herein contained shall authorize the grantees herein to enter upon the surface of a claim owned or possessed by another."

There has also been since said date a reservation in all patents of the ground described; which is as follows:

(1) "That the premises hereby granted, with the exception of the surface, may be entered by the proprietor of any other vein, lode or ledge, the top or apex of which lies outside of the boundaries of said granted premises, should the same in its dip be found to penetrate, intersect or extend into said premises, for the purpose of extracting and removing the ore from such other vein, lode or ledge."

Section 2320, Rev. St., provides for the location of mining claims "upon veins or lodes of quartz, or other rock in place, bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits." The act of January 22, 1880 (1 Supp. Rev. St. p. 276), speaks of vein, lode, or ledge sought to be patented.

The land department has considered, in view of all these provisions of the statute, that it was proper to word a patent for mineral land embracing a vein, lode, or ledge, as above described. To interfere with this construction of the said mineral land acts would disturb many rights long enjoyed. A contemporaneous construction of a statute by those compelled to act thereunder is entitled to great weight. The lodes, veins, or ledges conveyed are those embraced within the mining claim located and granted in the patent. The presumptions are in

favor of the correctness of the land department in issuing this patent. Its action was within its jurisdiction, and we cannot go behind the same in a collateral action. Looking, then, at the patent, we observe that appellant was granted extralateral rights. If, then, appellant, in entering the premises embraced within the lines of appellees' claim, beneath the surface, followed down on its dip a lode whose apex was within its ground, and whose strike was cut by the end lines of its claim as patented, it was pursuing a course to which it had a legal right.

It is further urged by appellees that this court is bound by the findings of facts of the circuit court, unless they are found to be clearly and palpably erroneous. On an appeal in an equity suit, the whole case is before the court, and it is bound to decide the same, so far as it is in a condition to be decided, on its merits. Beach, Mod. Eq. Prac. p. 978; Ridings v. Johnson, 128 U. S. 212, 9 Sup. Ct. 72; Garsed v. Beall, 92 U. S. 684–695; Johnson v. Harmon, 94 U. S. 371. If a case has been referred to a master, and he has made findings of fact, there ought to be exceptions to the same, if any party to the suit is dissatisfied therewith, and a ruling upon the same made by the chancellor. If this course is not adopted, these findings cannot be reviewed on appeal. It is to be observed, however, that the findings of fact by the circuit court are not without some weight in considering the merits of the case. This case, therefore, is presented to this court upon its merits, and must be considered upon the evidence, with such aid as may be found in the findings of the circuit court. The main issue, upon the evidence, is as to whether what is called by the witnesses the "south vein" is a part of a mineralized zone, which may be denominated a "lode," and which has its apex in the Silver King ground, or is a separate vein or lode, having its apex in the Oriental No. 2 and Red Cloud mining claims. If it should be determined that this south vein is no part of a lode having its apex in said Silver King claim, then the difficult question that may be presented if the court should find otherwise is not involved. This question is as to what would be the rights of the parties if it was found that the south and north veins were part of one lode, as the said lode would be cut by the south side line of the Silver King lode and the north side line of the Oriental No. 2 and the Red Cloud claims. In considering the question as to whether this south vein is part of a mineralized zone, which would come under the definition of a "lode," as used in the mineral land act of congress, we are presented with the definition of a "lode" as given by Justice Field in the Eureka Case, 4 Sawy. 302, Fed. Cas. No. 4,548. That definition made the term "lode" "applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock. It includes, to use the language cited by counsel, all deposits of mineral matter found through a mineralized zone or belt coming from the same source, impressed with the same forms, and appearing to have been created by the same process." In considering this definition, the facts which confronted that distinguished jurist in that case should not be lost sight of. He found a limerock formation lying between two clearly-defined walls, each hav-

ing a definite dip, one composed of shale and the other quartzite. The quartzite wall exhibited marks of movement on its surface; that is, attrition. This is one of the distinguishing marks of a vein or lode. This lime rock between said walls was of a peculiar character, and differing from that above the shale. The stratification common to lime rocks in their normal condition had by some force of nature been destroyed, and the whole mass crushed and fissured. There were two other facts presented by the evidence in that case which it would appear might also have been noticed by the distinguished jurist. The evidence presenting said facts has been read in this case, and made a part of the testimony of the witness Hammond. These facts are: (1) That the lime rock found between the walls named was what is called magnesian or dolomite lime rock. This is a lime rock which has, through some dynamic force or agency, undergone a metamorphism. Usually such lime rock by one of said forces has been changed in its constituents, besides having its stratification destroyed. (2) That this class of lime rock often constitutes the lead or lode in which lead ores are found. In one portion of said evidence Mr. Hunt states that these dolomite or magnesian lime rocks are the formation in which most of the lead deposits of the world occur. He also quotes Mr. Van Cotta, to the effect that the magnesian lime stone itself has something to do with these deposits. The ores found in the Eureka were lead-silver ores. Let us see whether the facts in this case bring the premises in which the south, north, and middle veins are found within the definition of a "lode" found in the Eureka Case. The country rock where these veins are found is a volcanic rock termed "liparite." It extends several miles above and to some distance below where these veins are found. In the ground between the north and south veins the liparite is more broken up than elsewhere, unless it be in the ground between the south vein and a vein south of this called the "AA and BB vein." In the fissures there is, perhaps, more spar than is elsewhere found in the liparite. The north vein rests upon a clearly-defined foot wall. There is a hanging wall over the south vein. Between these two veins the liparite was softer than in other places, and there had occurred a greater kaolinization in its fissures than elsewhere. I have stated that it appears that there was a well-defined foot wall to the north vein and a hanging wall to the south vein. The evidence also shows that there was a clearly-defined foot wall to the south vein and a clearly-defined hanging wall, other than the hanging wall of the south vein, to the north vein. In fact, the characteristics of the two veins are very similar. Mr. Janin, a witness for appellees, says, in speaking of the south vein:

"The vein itself has very strong and distinctive features of a foot wall that is continuous. The vein filling is to the south,—that is to say, towards the hanging-wall side,—with occasional breaks on the foot-wall side, where it shows some jasper, at least; and I presume it was a portion of the vein filling once. So it is easy to trace throughout this whole length of 2,000 feet on the surface, and also in depth. I therefore consider it to be a very continuous, strong vein, so far as it is marked and goes. The vein is like all other fissure veins, or, rather, it has the fissure faulting plane, because it shows some evidence of movement and the hanging wall is somewhat broken. At the Oriental shaft on the

upper level the foot wall is very highly polished. Indeed, it shows slickensides very plainly, and it shows there must have been some movement."

A little further in his evidence the witness says this vein has a regular dip, which he describes. There are many other witnesses in the case who note and describe this foot wall, and some the hanging wall of this south vein. It is not necessary to quote all this evidence. The witness Aldersley, who was examined on the part of appellant, admits that in some places he found the foot wall of this south vein. He says that the hanging wall thereof was for about four-fifths of the distance along its strike, as exposed, composed of what he terms "bird's-eye porphyry," or what is locally called "bird's-eye," and one-fifth mud or brown tuffa. He says that this bird's-eye is all the way from 20 to 5 feet thick, according to the locality where found. In describing the north vein, upon cross-examination, the witness says:

"Q. The slip was there? A. Yes, sir. Q. Now, then, when they took it out, did they take all out between the foot wall and the hanging wall at the surface? A. Not altogether. It has been taken out since the first working. Q. Well, was the hanging wall as well defined as at the foot wall? A. Yes, sir. Q. It was? A. Yes, sir. Q. The whole distance was? A. Yes, sir; well, no hanging wall is ever as well defined as the foot wall, in that position, and I would like to correct myself in that statement. Then that foot wall is a perfect plane, nearly,—as nearly as can be in a mine,—but the hanging wall did not have that condition. Q. Well, was there any hanging wall distinctly to be traced at the surface? A. Yes, sir. Q. Well, to what extent along the vein was that the case? A. Very near two-thirds of the way. Q. From which end? A. From the east end. Q. To where? A. From the east end two-thirds of the way westward. Q. Along the claim? A. Along the claim,—along the outcrop of the vein. * * * Q. Now, what was the appearance of the hanging wall for a distance from the surface down 20 feet? A. It had a perfectly smooth, but irregular, surface. Q. For twenty feet? A. Yes, sir. Q. And what extent on the strike of the vein,—whole distance? A. The whole distance, as far as I knew. There is some parts that are not exposed, and them I cannot vouch for. Q. But there is some of that wall exposed there, isn't it? A. Yes, sir. Q. That hanging wall? A. Yes, sir. Q. What is the character of the rock? A. Bird's-eye porphyry. Q. Bird's-eye porphyry right through? A. Yes, sir. Q. Any of it mud? A. No, sir. Q. How far below the surface, following that bird's-eye porphyry, do you have to descend before you strike the mud? A. At what point? Q. Any point. A. Well, as I said before, on the surface of the Cunningham shaft the mud is about 40. The bird's-eye is about 40 feet wide. Consequently the mud would be 40 feet from the vein. Q. What did you mean by 'mud' at that point? A. I mean a soft, friable sandstone. Q. Is it not porphyry? A. No, sir."

The witness in other parts of this evidence shows that his "bird's-eye porphyry," as he calls it, extends down as a hanging wall to this north vein to its lowest workings. This north vein, then, has all the characteristics of a vein or lode. It has a foot wall clearly defined, and a hanging wall clearly defined. In both the south vein and in the north vein spar impregnated with ore is found between these walls, as a rule. There is another fact worthy of remark. The vein still further south, called the "AA and BB vein," has been described. In the evidence of Mr. Hammond and other witnesses we find that this vein has also a liparite foot wall, and the material called "bird's-eye" for or on the hanging wall. This material is from 5 to 20 feet thick. This AA and BB vein is on a horizontal plane about 600 feet south of what is called the "north vein" in the

Silver King ground. The characteristics of this vein and that of the south vein, so called, and also the country between them, are so similar to the north vein and the country rock between the north and south veins that the expert witness J. Ross Brown claims that it is also a part of the Silver King lode, and that all this country lying between the north vein and AA and BB vein is one lode. Mr. Edwards, one of the witnesses for the appellees, says that spar in the region of all these veins is a part of the country rock. Considering all of the evidence, I am inclined to think this is correct. This spar occurs to a greater extent in some parts of the country than others. This fact would not prove, however, that, where it abounded in the fissures of the liparite, it proved that a vein existed. The appellant urges with some force that the assays made from the ground show that from the foot wall of the south vein to the north vein the whole mass is impregnated with silver, and that the country south of the south vein does not show this condition. But it should be borne in mind that the material sampled south of the south vein was the mud or brown tuffa. This was no fair test. That there is liparite between the south vein and the AA and BB vein would appear from the evidence as to the character of the foot wall of this last-named vein. The evidence, I think, shows that this brown tuffa or mud is only a surface deposit resting upon liparite, which is the prevailing country rock. This is the opinion of Mr. Janin. To have presented a fair test, the liparite south of the south vein should have been tested. The mining engineers and scientific witnesses who gave evidence in this case did not differ materially as to the physical facts presented, but, as is usual with such witnesses, according to the sides in whose interests they were sworn, they had different opinions as to what these facts demonstrated. The circuit court inclined to place the greatest reliance upon the opinion of Mr. Janin. As we consider the facts in this case, we are disposed to concur in that view. We cannot see that the facts presented in this case are of the character which confronted the court in the Eureka Case. In the case of Mining Co. v. Callison, 5 Sawy. 439, Fed. Cas. No. 9,886, the court said, in speaking of the Eureka Case:

"It never was intended in that case to hold that every metalliferous country to which boundaries could be found must be regarded as one vein or lode, for this would reduce all mining districts to one lode."

Judge Sawyer, who was one of the judges who sat with Justice Field in the Eureka Case, also presided at the trial of this last case.

We hold, therefore, that what has been termed the "south vein" is no part of the Silver King lode, but a separate and distinct lode, meeting the usual definition of a "lode" or "vein"; that is, an aggregation of mineral matter containing ores in fissures of rocks. So far as this vein lies within the boundaries of Oriental No. 2 and the Red Cloud mining claims, it belonged to the appellees (the plaintiffs in the court below), and the appellant had no right to enter upon the same.

The appellant presents another question for consideration. It is claimed that, admitting that the south vein is no part of the Silver

King lode, still appellant should not be enjoined from entering upon the same, for the reason, as it is urged, that the end lines of the Silver King cut this vein. It would appear from the evidence that this south vein on its eastern strike does enter the Silver King ground, and passes out of its east end line. The apex of this vein is not shown to be in the ground at this point, but it is a fair presumption that it is, from its course and dip. The said vein, on its westerly strike beneath the surface, until it passes the westerly end line of the Silver King claim, is within the Oriental No. 2 and Red Cloud claims. The cropping of the apex of this vein, however, on the Red Cloud premises, has a course towards the south side of the Silver King lode. In fact, there are some croppings cut by this south side line that are supposed to belong to this vein. This is not, however, fully established. The evidence is not sufficient to show that the apex of this vein is found anywhere within the Silver King premises opposite to the Red Cloud lode. The burden of proving this was upon the appellant, as the vein in this locality beneath the surface of the Silver King is nowhere found. If the vein in its course from east to west should be found, along on its apex, to pass out of the Silver King lode and into the Oriental No. 2 ground, from this into the Red Cloud ground, and then back again into the Silver King premises, and westerly out of its west end line, there certainly could be no right in appellant to any part of the vein, the apex of which was not in the Silver King premises. The grant is to lodes having their apex in the ground patented. The fact that a part of the apex might be in the ground granted would not give any right to that part of the apex which is not therein, although the apex might be cut by both end lines of the granted premises. There is no case that supports this doctrine. The case of Bullion, Beck & Champion Min. Co. v. Eureka Hill Min. Co., 5 Utah, 3, 11 Pac. 515, is a case where the croppings were cut on the strike of the same by a side line of a location. The court gave the vein to the oldest locator. The case of Argentine Min. Co. v. Terrible Min. Co., 122 U. S. 478, 7 Sup. Ct. 1356, cannot be well understood from the statement of facts in the case. It is believed, however, that the facts in this case showed that the vein in dispute and its croppings on their strike passed out of one claim into the other in a circular course, and crossed the Adelaide claim from one side line to the other. The parties litigant came together in the Adelaide ground in following down from the croppings in the surface premises of each on the dip. The court gave the ground in dispute to the oldest locator. It would appear that, according to their locations, both had lateral rights. The only question that could arise, if the facts were as appellant claims, is whether it could follow down on the lode from that part of the apex thereof in its premises into the premises of appellees. This is a disputed question in mining litigation. As I have stated, however, the evidence does not warrant the court in saying that there is any part of the apex of the south vein in the Silver King premises opposite the Red Cloud claim. As to what would be the right of appellant in the Oriental No. 2 premises, if the south vein, after it passes on its strike into the Silver King ground, on its dip entered the Ori-

ental claim, we do not decide.    The case is not argued and presented
to us upon that state of facts.    It does not appear that, from the point
where the apex of the south vein going east may cross the south side
line of the Silver King claim, the appellant has entered the Oriental
No. 2 premises on the dip of the same.    We have nothing presented,
then, upon which to base a decision.    The decree of the court below
is therefore affirmed.