THE ALASKA GOLD MIN. CO. v. BARBRIDGE et al.

(First Division.   Juneau.   December Term, 1901.)

No. 49a.

1. TIDE LANDS—MINES AND MINING.

Lands lying below ordinary high tide on the shore of the ocean and arms of the sea in the District of Alaska are not subject to location under the mining laws of the United States.

2. MINES AND MINERALS—EVIDENCE—PATENT.

As a general rule the recitals in a mining patent are conclusive evidence of the extent and boundaries of the claim; other evidence may be admitted to determine the location of the monuments and boundaries called for by the patent.

3. INJUNCTION—TRESPASS.

One who, within the District of Alaska, trespasses upon the tide lands not subject to location under the mineral laws of the United States, may be enjoined from sinking shafts thereon, and

causing an increased flow of water into, and threatening the complete flooding and irreparable injury to, lower levels excavated by an adjoining mine owner underneath the same tide lands in following his vein or lode beyond his boundary line.

Action to Restrain Damage to Mine.

Maloney & Cobb, for plaintiff.

Crews & Hellenthal, for defendants.

BROWN, District Judge.   This action was brought to restrain and enjoin the defendants from sinking a certain shaft situated at a point where the surface of the earth is below mean high tide on Gastineau channel, and immediately above the workings of the plaintiff corporation on a vein or lode, the apex of which is within the surface boundaries of the mining claim of the corporation.   It is alleged that, by following the vein or lode on the dip thereof, the plaintiff has passed beyond the side line of its lode mining claim and beyond the shore line of Gastineau channel, which said channel is an arm of the sea, and is now working under said arm of the sea, the greatest working depth attained being about 900 feet; that the defendants, in sinking their shaft and discharging blasts in that behalf, cause the ground beneath to vibrate and the waters of the sea to flow through fissures in the rock that forms the roof above the workings of the plaintiff, thereby causing large quantities of the water of the sea to flow in upon the plaintiff, to its great and irreparable injury; and that, unless the defendants are restrained from further pursuing the work of sinking their said shaft, the plaintiff's mine will become flooded and made valueless.   The defendants deny these matters generally, but admit they are engaged in sinking a shaft, etc.; allege it to be on a lode mining claim properly located by them, and that their work in no wise damages plaintiff.   This is practically the case before the court.

The evidence shows that plaintiff has a patent to its certain mining claim, and the patents offered in evidence show by reference to points, distances, courses, etc., that the line of said claim, at some points, is some little distance from the shore line of mean high tide of said channel. It further appears that the defendants have sunk shafts a few feet in depth, the surface at the point of sinking being above mean high tide, and have exposed rock in place of some value, the quartz taken therefrom showing good value; that shafts have been sunk at one or more places, the defendants claiming a lawful location of a lode mining claim, and that they are entitled to work the same even though some injury should result therefrom to the plaintiff. It is admitted that the particular shaft complained of is on what defendants claim to be the strike of their vein, and that the surface where said shaft was begun is below mean high tide. It further appears from the evidence, the admitted facts, and the personal observation of the court when present upon the ground, on invitation of the parties to this action, that only a few feet of the vein claimed by defendants extends, at either end thereof, above mean high tide, and that, following the strike of the vein or lode a few feet from the point of discovery, the vein passed below the tide line, and that the apex of the vein, except at low tide, other than these few feet, is beneath the sea, and a considerable portion is below even low tide.

It is contended by the defendants that, under the mining laws of the United States, all of the public mineral lands of the United States are subject to exploration and location; that mineral lands below high tide are a part of the public mineral lands of the United States, and therefore subject to exploration and location the same as the like character of land above high tide; that, beginning at or near the shore line, the defendants have a right to follow a vein upon the

strike thereof beyond the shore line beneath tide waters for the entire length of a claim. As before stated, except for a few feet, the apex of the entire vein claimed by the defendants is below the tide line. The above proposition is denied and contested by plaintiff. It is further claimed by plaintiff that plaintiff's land runs to the shore line of Gastineau channel and to mean high tide thereof; that the points designated by stakes constitute the meander line, and, though these are a few feet back from the point of mean high tide, their patented land in fact runs to mean high tide; and that therefore there is no land above shore line on which defendants could sink a shaft, make explorations, or locate a lode mining claim or any part thereof.

Thus are outlined the main points contested in this case. To what extent it is necessary for the court to follow these in order to determine the rights of the parties under the pleadings, the court does not at this time determine. It is sufficient to say that some of them will be examined. The arguments of counsel have been long, learned, and highly interesting, but, if counsel will excuse the court for so saying, unnecessary to follow at length in order to determine this case.

It seems to be expedient to determine, first, whether a mining claim can be located on lodes situated on the shore of the sea below mean high tide, or whether, where the vein or lode extends on its strike beyond the shore line under the sea, the discoverer can lawfully locate the part of the lode above mean high tide, and include in such location the larger part thereof that lies below the waters. Stating the proposition in another way, can the locator of a mining claim lawfully include in his claim any mineral lands of the United States that may extend into and under the sea below mean high tide, or must his claim end at the shore line?

Section 2319 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 1424] provides that:

"All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States," etc.

It is claimed that the language of the section is broad enough to include land below, as well as above, high tide. Considering the language of the section, it might possibly include any of the mineral lands of the United States; but, under the policy of our government, the tide lands have never been sold by the general government. The original states, upon the formation of the Union, held the tide lands subject to their several control. In order that new states, carved out of the various portions of the public domain, should, when admitted as states of the Union, be admitted on an equality with all the other states, it has been deemed wise —and perhaps obligatory upon the general government—to so hold these tide lands that, when the new states should be formed, they should be transferred to the sole control of such states, to be disposed of as might seem wise to them. Considering this policy of the government in dealing with this class of lands, it would seem that the legislation by Congress relative to the disposition of its agricultural and mineral lands should be treated as subject in this respect to this general policy. It has been frequently said by our courts of last resort that these tide lands do not really belong to the United States, and are not subject to disposition, but are simply by the United States held in trust for the new states that shall be carved out of the public domain. Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428. See, also, Shively v. Bowlby, 152 U. S. 47, 14 Sup. Ct. 548, 38 L. Ed. 331; Knight v. The U. S. Land Ass'n, 142 U. S. 163,

12 Sup. Ct. 258, 35 L. Ed. 974; Weber v. Commissioners, 18 Wall. 65, 21 L. Ed. 798.

While this doctrine is supported by high authority, it seems to me that it is true only in the sense that the general government has established this policy in dealing with its lands. That the general government is the owner, and might, if it chose, dispose of them as it pleased, I have no doubt. But it is not difficult to perceive that the disposition of the tide lands in the outlying district of the United States might, when new states should be carved out of the public domain, create difficulties in the admission of the same as states of the Union; hence the policy of the government. It is fair to conclude, in construing the act of Congress providing for the disposition of the public lands of the United States, that the Congress only intended to provide for the disposition of such lands as have been held for disposition under the general policy of the government. In Weber v. Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798, Mr. Justice Field, delivering the opinion in the case, said:

"Although the title to the soil under the tide waters of the bay was acquired by the United States by cession from Mexico equally with the title to the upland, they held it only in trust for the future state. Upon the admission of California into the Union on an equal footing with the original states, absolute property in, and dominion and sovereignty over, all soils under the tide waters within her limits, passed to the state, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters."

In Knight v. U. S. Land Association, Mr. Justice Lamar said:

"It is the settled rule of law in this court that absolute property in, and dominion and sovereignty over, the soils under the tide waters in the original states, were reserved to the several states, and that the new states since admitted have the same rights, sover-

eignty, and jurisdiction in that behalf as the original states possessed within their respective borders."

In the case of Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428, Mr. Justice Bradley, speaking for a majority of the court, said:

"With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high-water mark, and that the title to the shore and lands under water in front of lands so granted inures to the state in which they are situated, if a state has been organized and established there."

In many other cases in the Supreme Court, the dictum is frequently found that the lands belonging to the United States, in territories, below high-water mark, are held in trust for the future state, and title therein is not vested in the United States, to the extent that the same might be sold. If this should be deemed to be true as a legal proposition, then, of course, as before stated, the laws of Congress providing for the disposition of the public mineral lands could by no possibility include the lands below ordinary high tide.

But another result might follow if this were true. If the general government has no title in these lands, and holds them simply in trust, the title being in the future state, then a person having a lode location near the shore of the sea might not be permitted to follow his ledge on the dip beyond the shore line, because it is very apparent that, if the United States cannot dispose of this land, any grant it may convey in the sale of a mining claim must stop at the line of the grant, and cannot extend into lands that the United States does not own. It is well settled that, where agricultural lands have been conveyed by patent, a party obtaining title to a contiguous mining claim cannot follow the dip of his vein beyond a point where a line let fall perpendicularly from the boundaries of the agricultural land would strike the dip of the vein. This is true because, where agricultural

land is conveyed by the United States, it carries everything with it, not only within its boundaries upon the surface, but to any depth which the party may seek to go to explore it. But, as before stated, it is not believed that these dicta—by our very learned Supreme Court in many cases—can be the true theory of the law in these matters.

Mr. Justice Gray, in Shively v. Bowlby, 152 U. S. 47, 14 Sup. Ct. 565, 38 L. Ed. 331, after quoting many of the decisions on this question, says:

"Notwithstanding the dicta contained in some of the opinions of this court already quoted to the effect that Congress has no power to grant any land below high-water mark of navigable waters in a territory of the United States, it is evident that this is not strictly true."

Judge Gray in this case, referring to the opinion of Chief Justice Taney, says:

"One delivering an opinion already cited, after the subject has been much considered, in cases from Alabama, said, 'Undoubtedly Congress might have granted this land to a patentee, or confirmed his Spanish grant, before Alabama became a state.'"

Again, Judge Gray says:

"By the Constitution, as is now well settled, the United States, having rightfully acquired the territories, and being the only government which can impose laws upon them, have the entire dominion and sovereignty, national and municipal, federal and state, over all the territories so long as they remain in a territorial condition"—citing many cases. "We cannot doubt, therefore," continues Judge Gray, "that Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States hold the territories. But Congress has never undertaken by general laws to dispose of such lands. And the reasons are not far to seek."

Speaking of the policy of the general government in reference to these particular lands, Judge Gray says:

"The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior or on the coast, above high-water mark, may be taken up by actual occupants, in order to encourage the settlement of the country, but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways, and, being chiefly valuable for the purposes of commerce, navigation, and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government, but, unless in case of some international duty or public exigency, shall be held by the United States in trust for the future states, and shall vest in the several states, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older states."

Concluding this opinion, which is very learned and reviews all the cases upon this subject, Judge Gray says:

"The United States, while they hold the country as a territory, having all the powers both of national and municipal government, may grant, for appropriate purposes, titles or rights in the soil below high-water mark of tide waters. But they have never done so by general laws, and, unless in some cases of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters and the soil under them to the control of the states, respectively, when organized and admitted into the Union."

From the discussion of this question by the learned Mr. Justice Gray, we think it is evident, considering the general policy of the government, that Congress never intended, by its act giving to citizens the right to go upon the public lands and explore the same for mineral, and obtain title thereto on proper discovery and location, that such right should ever extend to the lands lying below ordinary high

tide on the shore of the ocean and the arms of the sea. The conclusion of the court, therefore, in this case, is that, if the defendants have acquired any right in the lands upon the shore of Gastineau channel, so soon as their vein on. the strike thereof goes beyond the shore line and below mean high tide, they can make no claim whatever thereto; and in going upon a ledge or lode at any such place, and undertaking to occupy the same and acquire title, they place themselves in the position of trespassers having no rights whatever in the land or the lode, and no right to occupy or possess the same.

Second. It is claimed on the part of the plaintiff that the patented lands constituting their several lode mining claims run to the shore of Gastineau channel, and that there is no land between their lode claim and the said channel upon which the defendants could lawfully enter to make exploration or discovery; that the apices of any veins that can be found above mean high tide along the shore of said channel, opposite their several patented claims, are all within the boundary lines of their several patented claims; that the meander line fixing the boundaries of their several claims, while indicated in the patent and survey by several stakes and monuments, is in fact the meander line of Gastineau channel, notwithstanding such fixed boundary points as are described in the patent. In aid of the description of the land covered by their several patents, they offer the field notes of the survey made by the United States mineral surveyor Garside, and also the oral testimony of Garside, to show the intent and purpose of said survey in fixing said boundary line along Gastineau channel. When this evidence was offered, objection was made by the defendants, on the ground that the same was incompetent, and that the patent is the only competent evidence that can be offered in this case to show the lands embraced by the same. It is believed that

the legal effect of a conveyance must be determined by the terms employed therein, and that nothing can be added to or taken from the same by parol testimony.   This is undoubtedly the general rule controlling the question of testimony. Fletcher v. Phelps, 28 Vt. 262; Platt v. Jones, 43 Cal. 219; Bartlett v. Corliss, 63 Me. 287.   But if there is a latent ambiguity in the description itself as furnished by the deed or patent, then the true intent and meaning may be added by parol.   White v. Lunning, 93 U. S. 515, 23 L. Ed. 938; Pride v. Lunt, 19 Me. 115.

As to patent for mining claims, as a general rule, a patent is conclusive as to the limits of a location, and it cannot be assailed by showing that its actual boundaries are different from those described in the patent.   In Waterloo Min. Co. v. Doe, 27 C. C. A. 50, 82 Fed. 45, it was claimed that a certain portion of the ground had been omitted from the patent through the fraudulent acts of one Bohton.   The acts of Bohton, the court thought, did not amount to fraud, and, in the absence of fraud, it was held that the patent was conclusive evidence as to the limits of the claim patented.   In 27 C. C. A. 50, 82 Fed. 45–50, the question arose as to whether the party in possession under the patent could follow the dip of their vein beyond the side lines extended down vertically.   The defendant in that case contended that the plaintiff had no extralateral rights, as his end lines were not parallel.   The plaintiff's patent, however, described the end lines as being parallel.   The court held that, since the patent described the end lines as parallel, the court was bound by the terms thereof, and no evidence could be received that tended to show that the end lines were not parallel.   The court said:

"The presumptions are in favor of the correctness of the land department in issuing these patents.   Its action was within its jurisdiction, and we cannot go behind the same in a collateral action."

1 A.R.—21

Again, in Golden Reward Min. Co. v. Buxton Min. Co., 38 C. C. A. 228, 97 Fed. 413, the contest was between two patented claims—the Bonanza and the Silver Case. Fraud was alleged, but not proven. The court held that, in the absence of fraud or mistake, the boundaries as described in the patent were conclusive.

It is said in the case at bar that the field notes that have been offered in evidence make reference to the meander line of Gastineau channel, but the patent offered in evidence makes no reference to Gastineau channel whatever, and determines the lines by the monuments and courses and distances run. The contention of the defendants is that the field notes of the surveyor cannot be introduced to help out the lines established by the patent, or to explain the same; that there is no latent or patent ambiguity in the conveyance issued by the government, and that there is therefore nothing to explain. It is not claimed by the plaintiff that there is any mistake in the patent. And not only are the field notes of the surveyor that were offered in evidence objected to by the defendants, but also the oral testimony of Surveyor C. W. Garside as to what his intentions were in fixing the line of the claim owned by plaintiff bordering on Gastineau channel. My recollection is that the field notes referred but once to the tide water of the channel. Nothing in the field notes and nothing in the patent is found fixing the boundaries of the claim on that side by the line of the sea or the shore line of Gastineau channel. The court is unable to see in what particular the field notes of the surveyor aid or explain the directions and distances given in the patent itself. The field notes are therefore rejected as evidence in this case, as also are the statements of the witness Garside as to his intentions in making the survey of said claim. It is evident that the surveyor's intentions did not enter into the consideration of the land department when title was con-

veyed to the land in question. They cannot, therefore, be considered in determining what land the government intended to convey by its patent. Garside's testimony, however, that he placed the different stakes that bounded the claim on the side next to Gastineau channel, upon the line of ordinary tide is, perhaps, testimony of importance in the case.

Third. Another fact that may be considered of some importance in determining the rights of the parties to this action is the width of the claim that was patented, and that is now owned by the plaintiff. An examination of the maps offered in evidence, and the patent itself, as to the distances, shows that the claim is not 600 feet wide, and that the claimants did not take 300 feet on each side of their vein, as was their right under the law. Having taken less than the full width on the side bordering on Gastineau channel, the only possible reason that could exist to indicate why the claim was not taken of its usual width must have been the limit that was fixed by natural conditions, viz., the shore line of Gastineau channel.

The defendant Barbridge, in testifying in this case, says that a certain stake, that was pointed out to the judge of this court when examining the ground in person and while the attorneys and officers and parties were present, is now where it has stood for many years and where it was originally placed. This stake was placed upon the bank, as close to the edge of the same as it could be planted, and where the bank from the beach rises abruptly some six feet or more, and as close to the tide line as it could well be placed without danger of being washed away by the waves that would roll up at times from the sea, the waves having evidently at times washed away the ground up the edge of the embankment on which the post was placed. MacDonald, the manager of the plaintiff corporation, stated in the presence of the court that this stake, so far as he knew, was one of the posts

marking the boundary of plaintiff's claim. Another point marked and designated on this line as at the corner of the mill was evidently below mean high tide before the beach at the shore of the sea had been filled in by débris and waste from the mill. But at the point where the stake is there was a controversy between MacDonald, on behalf of the corporation, and Barbridge, one of the defendants, as to whether the shaft of the defendants, a hole about six or eight feet deep that had been sunk near the post referred to, was in part within the boundaries of the patented claim, or whether the same was all outside. The court is of the opinion that it is not important whether said shaft is in part within, or in part or wholly without, the lines of the patented claim. In Railroad Co. v. Schurmeier, 7 Wall. 272, 19 L. Ed. 74, it is said:

"Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser."

It is very earnestly contended by counsel for the plaintiff that this case is an authority in support of his claim that the line as indicated by the patent, and the survey as shown by the field notes, were simply the establishment of a meander line on the shores of Gastineau channel for the convenience of the government in determining the acreage of land within the proposed claim, and not with a view of excluding from the patent any portion of the land which might rightfully come within said claim that was above the tide waters of Gastineau channel. Many cases of this character are presented, but they all refer to surveys of the public agricultural lands of the United States and certain rules of the department that require the United States surveyors, in subdividing

sections where a portion thereof would border upon the sea or upon lakes or river or tide waters, not with a view of excluding any of the land from the fractional portion of the section, but to determine the price to be paid, etc.; and that, notwithstanding such meander line so established on the shore of a lake or sea, the land should run to the sea. But I fail to see the force of the principles and theories announced by the court in Railroad v. Schurmeier, and many other cases to the same effect, when applied to the case at bar. No authority has been shown vesting in the United States mineral surveyor any right or authority to establish a meander line, and the department very evidently refrains from any mention of such a line in the patent. No authority is shown under the rules of the Department of the Interior, having the sale of the public lands in charge, for arranging or establishing any such meander lines upon the mineral lands. It would, therefore, seem that in this case the court is bound by the usual rule that the language of the patent governs, and I am therefore compelled to hold practically that the lines of the claim in controversy are established according to the points, lines, courses, and distances mentioned in the patent.

In White v. Luning, 93 U. S. 524, 23 L. Ed. 938, the court says:

"It is true that, as a general rule, monuments, natural or artificial, referred to in a deed, control, on its construction, rather than courses and distances; but this rule is not inflexible. It yields wherever, taking all the particulars of the deed together, it will be absurd to apply it."

At common law the ordinary high-water mark is the boundary of the adjoining lands. Commonwealth v. Alger, 7 Cush. 53; Rogers v. Jones, 1 Wend. 237, 19 Am. Dec. 493. Had the land in question been bounded by the sea, the tide water, or by the harbor, bay, cove, creek, or any such words, or had the patent described a corner set upon the tide line at the

sea, and thence running with the sinuosities of the shore to another point, there would have been no question as to what land would have been included within the grant in this case. Whatever may be the rule for determining grants where they run to the sea—and unquestionably under all such descriptions they run to ordinary high tide and are bounded thereby —we have no such description in this patent, and we are bound to determine the boundaries of the land by the patent itself. But it is not always easy to determine to just what point the land embraced in the patent extends, because of the monuments being destroyed and thrown down or removed, as it is claimed in some instances they were in this case. We may be compelled to resort to parol evidence, surveys, and measurements, to determine the point at which monuments were placed and should be found. Such evidence has been offered and received in this case. The testimony of Garside, the original surveyor of these claims, is to the effect that the posts and monuments, as originally set, were placed upon the tide line, and that the line indicated between the monuments was as near on the tide line as it could be placed. Considering this testimony, and considering further the width of this claim, its relation to the tide line, the quantity of land conveyed being less than is usually covered in a full-sized mining claim, 600 by 1,500 feet; the fact that the full 300 feet is not taken on the side line next to Gastineau channel—all these matters may be reasonably considered in determining where the line of this claim really was and is, and what and where the lands are as described in the terms of the patent. While this question is not one necessary for the court to decide in this case, I am inclined to the opinion that the patented claim owned by the plaintiff company ran to ordinary high tide and included all the land above high tide within its limits, and that there was, in fact, no land above high tide upon which a location could be properly

made by the defendants.   But, as stated, this is not a matter of any special interest to the court, and one that the court does not now definitely pass upon.

Fourth. The proposition before the court is in reality a simple one.   The defendants were about to sink a shaft at a point close to the shore of Gastineau channel, over which the tide ebbed and flowed every day, and which was immediately above some of the workings of plaintiff in this case. These people were here upon this land below mean high tide, where they could acquire no right whatsoever, and where they were trespassers upon the lands and rights of the United States.   The plaintiff is the owner of several patented claims; has expended many hundreds of thousands of dollars in developing the same and in extracting minerals from the ores therein; has, it is said, distributed among its stockholders from $4,000,000 to $5,000,000; is employing about a thousand men; and has followed down on the dip of its vein until it is now beneath the waters of an arm of the sea called "Gastineau Channel," and immediately beneath this particular shaft of the defendants.   It further appears that any work on the shaft of defendants in question, and the blasts being exploded there, so increase the flow of water through the roof above where the plaintiff is taking out ore that, if continued, it will drive plaintiff from its mine and prevent the further working of the same; and because of this result plaintiff asks that the defendants be restrained from such work.

If these defendants had an unquestioned right to occupy the ground where they now are, and to develop a lode which they may have undertaken to locate and that is situated below tide water, they could hardly use their own in such a way as to bring inevitable calamity on their neighbor.   One may not sink on the line of his own ground and excavate it in such a way as to allow his neighbor's land to fall into

the excavation so made.    Matters of this character have been so frequently determined that they now need no discussion and no citation of authorities; the proposition is settled beyond controversy.    Can it be said, then, that these defendants, having no rights whatever below tide water in the location and development of a mine so situated, may be permitted to enter upon and so work the same as to destroy the property of the plaintiff, which is engaged in a like business, but has reached the point beneath the tide waters by following the dip of a vein the apex of which is within its patented land?    While it is true that, under the general policy of the government, lands below tide water are not for sale and disposition, and have never been held for sale and disposition by the United States, these tide lands having been reserved to the states that might be organized out of the territories of the United States, the purposes for which these lands are held in trust for the future state are trade, commerce, navigation, and the convenience of the public, and for such purposes only.    If the plaintiff is usurping any of the rights of the government in the land it now possesses, by the working of its mining claim beneath the water of the sea, no one, save the United States, through its proper channels, can complain.    They are in possession, and by their efforts are adding millions to the wealth of the country.    The defendants, though trespassers upon the rights of the United States in going upon and locating land below ordinary high tide, were they in nowise damaging any one else, could not be stopped, perhaps, except upon complaint by the government.    But, as before stated, even if they were rightfully in possession of the ground where their shaft is being sunk, and were operating in a way to injure and destroy property owned by the plaintiff, the court is of the opinion that the defendants should be restrained and enjoined from further work.    Under the facts and circumstances of this

case, the court is compelled to the conclusion that the defendants should be restrained and enjoined from further continuing the sinking of their shaft, or further interfering in this behalf with the rights of the plaintiff.

It may be said in this connection that the situation of the parties plaintiff and defendant are not the same. The plaintiff has a lawful location, and, under the mining laws of the United States, a lawful right to pursue its vein on its dips beyond the side lines of its claim and wherever it may run; and while, as before observed, the lands below mean high tide are reserved from sale, it is believed that the law giving a party the right to follow all veins, the apices of which are within the limits of his claim, even outside of the side lines thereof, would permit him to go below the waters of the sea in following such vein, without trespassing any law of property existing in the United States.

The temporary injunction heretofore issued under the order of this court will therefore be made perpetual, and the plaintiffs are awarded their costs and disbursements.