**Steven Albert MAHER and Rebecca Maher, husband and wife, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 93–16398.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 16, 1994.

Decided May 26, 1995.

Sheldon Lazarow, Lazarow & Lazarow, Tucson, AZ, for plaintiffs-appellants.

Roger L. Duncan, Asst. U.S. Atty., Tucson, AZ, for defendant-appellee.

Before: SNEED, NORRIS, and HALL, Circuit Judges.

Opinion by Judge SNEED; Dissent by Judge NORRIS.

SNEED, Circuit Judge:

This appeal presents a single question of law: Is a plaintiff who enters federal land to work a mining claim an invitee or a licensee under Arizona tort law? The district court held that the plaintiff in this case was a licensee. We affirm.

### I.

In August 1989, Steven Maher was injured on federal land in the Black Hills Rockhound

Area when an access road gave way underneath the backhoe he was driving, causing the vehicle to roll down an embankment. The road was among several thousand miles of dirt roads running through federal lands in the area. These roads are not maintained by the federal Bureau of Land Management (BLM), which has jurisdiction over the area. Maher was using the road to reach a mining site, one of several to which his family had laid claim pursuant to federal law. He was in the process of performing maintenance work on the sites in order to preserve the claims, as required by federal regulations.

Maher filed suit against the BLM under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), which permits judgments against the United States if "a private person[ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." After a bench trial, the district court held that, under Arizona tort law, the BLM owed Maher the duty owed to a licensee—that is, the duty "to refrain from knowingly letting [the licensee] run upon a hidden peril or wantonly or wilfully causing him harm." *Shannon v. Butler Homes, Inc.*, 102 Ariz. 312, 316, 428 P.2d 990, 994 (1967) (en banc). On appeal, Maher concedes that the BLM did not violate this duty of care, but he contends that the district court erred in not holding that he was an invitee owed a duty of reasonable care. We review the district court's finding of law *de novo*. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir.1978). This court has jurisdiction under 28 U.S.C. § 1291.

## II.

■ Arizona follows the common law regarding a landowner's duty to entrants, as recited in the Restatement (Second) of the Law of Torts. *See Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 142–43, 639 P.2d 330, 332–33

(1982); *Hicks v. Superstition Mountain Post No. 9399*, 123 Ariz. 518, 520, 601 P.2d 281, 283 (1979). At common law, an invitee is either a "public invitee" or a "business visitor." Restatement (Second) of Torts § 332(1) (1965). Maher maintains that he was an invitee under both definitions of the term. However, we agree with the district court that Maher was a licensee.

■ Maher first argues that the BLM expressly invited the public to enter the area to search for rocks, particularly "fire agates." *See id.* § 332(2). Even were this true, state statutory law relieves property owners of any duty to keep the premises safe for recreational users. Ariz.Rev.Stat. Ann. § 33–1551.[1] Maher therefore cannot take advantage of any general invitation to the public to "rockhound" as the source of his invitee status.

Maher's more substantial argument is that the United States "invited" him onto government land for the nonrecreational purpose of discovering and maintaining mining claims. The BLM counters that federal mining laws only "grant permission" to miners to enter public land and do not extend an "invitation." As the Restatement makes clear:

> It is not enough, to hold land open to the public, that the public at large, or any considerable number of persons, are permitted to enter at will upon the land for their own purposes. As in other instances of invitation, there must be some inducement or encouragement to enter, some conduct indicating that the premises are provided and intended for public entry and use, and that the public will not merely be tolerated, but is expected and desired to come.

Restatement (Second) of Torts § 332 cmt. d. The question, then, is whether the United

---

1. The version of the statute in force at the time of the accident provides:

   An owner ... of premises does not:
   1. Owe any duty to a recreational user to keep the premises safe for such use.
   2. Extend any assurance to a recreational user ... that the premises are safe for such entry or use.

3. Incur liability for any injury to persons or property caused by any act of a recreational user.

Ariz.Rev.Stat.Ann. § 33–1551(A) (1990) (amended 1993). The statute specifically provides that "premises" includes mining and forest lands. *Id.* at § 33–1551(B)(1). It applies to state and federal lands as well as private property. *Ward v. State*, 178 Ariz. 164, 168, 871 P.2d 711, 715 (Ct.App.1993).

States acted in a way that induced or encouraged the public, including Maher, to enter the Black Hills Rockhound Area to establish and maintain mining claims.

The federal mining laws under which Maher's family established its claims are "based on the notion that the mineral wealth of the public lands should be available to those who seek and find it and that the public lands should be free and open for such exploration and development." Rocky Mountain Mineral Law Foundation, *American Law of Mining* § 4.10 (2d ed. 1994). Congress has reiterated these goals, which date back to the General Mining Law of 1872 and even earlier, by stating that "it is the continuing policy of the Federal Government in the national interest to *foster and encourage* private enterprise in ... the orderly and economic development of domestic mineral resources...." Mining and Minerals Policy Act of 1970 § 2, 30 U.S.C. § 21a (emphasis added). Pursuant to this policy, Congress has provided that "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase...." General Mining Law of 1872 § 1, 30 U.S.C. § 22. Any person who discovers a mineral claim and complies with certain procedural requirements gains the exclusive right to possess the land and extract minerals from it. *Baker v. United States*, 613 F.2d 224, 225 (9th Cir.), *cert. denied*, 449 U.S. 932, 101 S.Ct. 332, 66 L.Ed.2d 157 (1980). It is therefore true, as Maher argues, that Congress sought to create incentives for individuals to explore and develop the resources of the vast public domain. "Under the mining laws Congress has made public lands available to people for the purpose of mining valuable mineral deposits.... The obvious intent was to *reward and encourage* the discovery of minerals...." *United States v. Coleman*, 390 U.S. 599, 602, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170 (1968) (footnote omitted) (emphasis added).

We nevertheless find that the *generalized* intent of Congress to encourage mining on public lands was not sufficient to constitute an invitation in this case. Such an invitation must be made with sufficient geographic specificity to define its scope. See Restatement (Second) of Torts § 332 cmt. 1. The "lands belonging to the United States" to which the mining statutes refer consist of roughly *725 million acres*—an area the size of India.[2] The public domain comprises nearly *one-third of all land* in the United States.[3] "[O]ne need but to raise [one's] eyes, when traveling through the West, to see the innumerable roads and trails that lead off, and on, through the public domain, into the wilderness where some prospector has found a stake (or broke [sic] his heart)...." *United States v. 9,947.71 Acres of Land*, 220 F.Supp. 328, 331 (D.Nev.1963). The entire public domain simply is not the discrete piece of property contemplated by the Restatement's rules defining the duties owed by a landowner.[4]

The difficulty with Maher's argument is that it confuses a national policy to encourage the development of the nation's mineral deposits with an intent to encourage, for

**2.** Michael Braunstein, *Natural Environments and Natural Resources: An Economic Analysis and New Interpretation of the General Mining Law*, 32 UCLA L.Rev. 1133, 1133 (1985).

**3.** Carl J. Mayer, Comment, *The 1872 Mining Law: Historical Origins of the Discovery Rule*, 53 U.Chi.L.Rev. 624, 625 n. 4 (1986). This enormous public domain is concentrated in twelve Western states: Alaska, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. Braunstein, *supra*, at 1133 n. 1. More than 50% of federal lands are located in Alaska; over 45% are located in the other eleven states. *Id.* Within these lands lie the country's richest deposits of natural resources. *Id.*

**4.** The Arizona Supreme Court's decision in *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 706 P.2d 364 (1985) (en banc) (superseded by recreational user statute, Ariz.Rev.Stat.Ann. § 33–1551), is not to the contrary. In *Markowitz*, the court assumed that a visitor to a public wilderness area was an invitee. Unlike this case, *Markowitz* involved a specific site, the 13,000–acre Lake Havasu Recreational Area. In this case, there was no conduct on the part of the United States with respect to the Black Hills Rockhound Area *in particular* that would make Maher an invitee. Furthermore, as noted above, *Markowitz* was effectively overruled by the Arizona legislature when it enacted the recreational user statute, Ariz.Rev.Stat.Ann. § 33–1551. *See Wringer v. United States*, 790 F.Supp. 210, 213 (1992).

example, a visit to a particular national park or the Capitol in Washington, D.C. The former is a general policy applicable to no specific site, while the latter is narrowly specific. Of course, after a mining claim is established, the government, by appropriate action, could convert the status of its holder to that of an invitee. There is in this case no showing that this has occurred. In any event, more must be shown than merely a reference to the general policy of mineral development and the establishment and maintenance of a claim.

The mining statutes do not constitute "an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and make them safe for [the public's] reception." Restatement (Second) of Torts § 332 cmt. a. These statutes, as applied to land in Arizona, only permit prospectors to go upon public lands of the United States to search for minerals and only obligate the United States to reveal hidden perils and to refrain from willfully causing the prospectors harm. *Shannon*, 428 P.2d at 994.

Maher also argues that he was an invitee because the road he was using was held out to be a public way.[5] For this proposition he cites *Harris v. Buckeye Irrigation Co.*, 131 Ariz. 540, 642 P.2d 885 (Ct.App.1982). In that case, the company that owned an irrigation ditch running through the town of Buckeye had built a bridge across the ditch. The bridge had for many years been heavily used by local residents, particularly schoolchildren, to cross the ditch. The parents of a boy who fell off the bridge and drowned brought a wrongful death suit against the irrigation company. The *Harris* court approved the trial judge's instruction to the jury to find that the company owed a duty to the boy as an invitee if it "has permitted people to use or establish a way across [its] property under such circumstances as to cre-

ate a belief that it is public in character." *Id.* 642 P.2d at 887.

*Harris* is distinguishable. First, unidentified people, not the government, built many roads across the public domain. *Harris* does not create governmental liability to Maher as an invitee based only on the fact that he was traveling on such a road. Under such an expansive application of *Harris*, Maher would have been an invitee had he been traveling on *any* road, anywhere within the entire public domain. By such reasoning, only a chainlink fence around the entire public domain adorned with warning signs would be sufficient to withdraw the invitation to enter. We must not extend *Harris* so far.

Second, though we assume *arguendo* that the government could be held liable to Maher as an invitee if the road had been built or maintained by the United States,[6] no evidence in the record supports this contention. To the contrary, the evidence shows that the BLM neither built nor maintained that road; though the road's origin is unknown, it was likely constructed by local ranchers at the turn of the century. *See* R.T., vol. I, at 51, 52, 57, 58–59, 64, 66, 71, 87; R.T., vol. II, at 34, 41, 46–49.

We therefore agree with the district court. Maher was a licensee. Accordingly, the district court's judgment is AFFIRMED.

WILLIAM A. NORRIS, Circuit Judge, dissenting.

This is a Federal Tort Claims Act case. As in all such cases, we are required to respect Congress' insistence that the United States be treated like any other person under state law, even when doing so is somewhat awkward. *See* 28 U.S.C. § 1346(b). In this case, we must apply the Arizona common law regarding the condition and use of land to a landowner whose vast holdings render it an atypical subject under the law. In such cases, it is tempting to simply say that the

---

5. We assume for the sake of argument that the road was in public use; however, we note that the evidence in the record suggests it was not used by tourists or rockhounds, and seldom by anyone, including Maher. *See* Reporter's Transcript (R.T.), vol. I, at 55–56, 130; R.T., vol. II, at 17, 35, 46.

6. *Cf. Seyler v. United States*, 832 F.2d 120 (9th Cir.1987) (holding that Idaho's recreational user statute did not bar suit against the federal government for injury caused by motorcycle accident on an ordinary public highway).

state law could not possibly be intended to apply to the United States. However, Congress has nonetheless instructed this court to apply the state law to the United States as if it were a private person. In this case, I fear that we do not give sufficient attention to that command and create what appears to be a special amendment to the Arizona common law which has the sole effect of exempting the United States from the landowner's duty to exercise reasonable care toward those it induces to enter its undeveloped lands in Arizona.

This case requires the application of the invitee-licensee distinction under Arizona law to a person working a mining claim on federal lands pursuant to the inducements created by the federal mining laws. 30 U.S.C. §§ 21 *et seq.* If Maher is found to be an invitee, then the Government owed him a duty of "reasonable care under the circumstances." *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 356, 706 P.2d 364, 368 (1985) (en banc).

The majority correctly states the test for determining whether Maher was an invitee by asking "whether the United States acted in a way that induced or encouraged the public, including Maher, to enter the Black Hills Rockhound Area to establish and maintain mining claims." Opinion at 1042; *accord* Restatement (Second) of Torts § 332(2) & cmt. d (1965) [hereinafter "Restatement"]. The majority then answers this question, conceding that "Congress sought to create incentives for individuals to explore and develop the resources of the vast public domain." Opinion at 1042. These incentives are far from trivial [1] and clearly constitute an inducement to enter the public domain sufficient to confer invitee status onto the plaintiff. *See* Restatement § 332 cmt. d. It is furthermore undisputed that the Rockhound Area is a part of the public domain into which Maher was encouraged to enter and, thus, Maher was acting within the geographic scope of the invitation when he was in-

jured. *See id.* at cmt. l. This should have ended our inquiry. But instead of remanding to the district court for consideration of the more difficult question of what "reasonable care under the circumstances" requires in the context of a vast wilderness area, the majority creates an exception to Arizona's law of invitation, the sole purpose of which seems to be to exempt the United States from the duty of reasonable care imposed upon private persons in Arizona who induce the public to enter their lands.

The majority holds that an invitation to enter the public domain in search of mining claims cannot be the sort of invitation contemplated under Arizona law because it simply encompasses too great an area—725 million acres to be exact. Opinion at 1042. The law of invitation was intended to impose a duty of reasonable care only upon those invited to smaller "particular" or "discrete" parcels of land, the majority argues, not to areas the size of India. *Id.* Thus, the majority carves out an exception to Arizona's tort law for possessors of very large holdings of land, which seemingly applies only to the United States. Because I have no reason to believe that the Arizona courts would create such an exemption and because I believe that Congress specifically instructed this court to abstain from giving the United States special treatment under state law, I dissent.

### I

In *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 706 P.2d 364 (1985) (en banc), the Arizona Supreme Court made clear that the size and condition of the land are not relevant to determining the standard of care owed to a visitor. Instead, the Court stated that "[t]he physical circumstances involving size ... and nature of terrain affect the determination of what is reasonable, not the existence of a duty to protect the safety of users...." *Id.* 706 P.2d at 367.

---

1. In fact, the generosity of these incentives has been severely criticized. *See, e.g.,* Michael Braunstein, *Natural Environments and Natural Resources: An Economic Analysis and New Interpretation of the General Mining Law*, 32 UCLA L.Rev. 1133, 1150–51 ("In order to 'excite' people to find minerals, the law offers a reward that

exceeds the value of the object sought: the finder keeps the minerals, and can purchase the land in which they are found for less than market value.... Not only is the reward offered to prospectors by the mining law too much, it is much too much").

In *Markowitz,* the plaintiff was injured in the Lake Havasu Recreational Area, a park comprised of 13,000 acres of desert and lake owned by the federal government and leased to the State of Arizona. David Markowitz had followed a footpath to a cove where he injured himself diving into shallow water. In court, he argued that the State owed him a duty of reasonable care, while the State protested that it owed the plaintiff no duty at all because of the impracticalities of exercising control over the natural environment.

The Arizona Court of Appeals was very concerned about imposing upon the government an onerous duty to control the hazards in the natural environment of large public lands:

> Lake Havasu Park is not unlike many natural areas in Arizona where matters of personal safety must necessarily be left to the individual since there are no other reasonable means of protection. In this sense, Lake Havasu Park is very much like other public lands which are open to the public, such a national forest land, national park land, *federal lands managed by the Bureau of Land Management* and various state lands. This varied, undeveloped natural environment, always inviting, but often dangerous, accounts for more than 75% of the geographical area of the State and is open to the public.... If a duty on the part of the federal or state government to take steps directed toward the safety of the public as it encounters the natural environment were to exist, it is difficult to say where it would start and where it would end.

*Markowitz v. Arizona Parks Bd.,* 146 Ariz. 260, 263, 705 P.2d 937, 940 (App.1984) (emphasis added). The court then stated that "[t]he issue of a land possessor's duty of care is intertwined with the nature of the use" and held that vastness and natural state of the land relieved the State of any duty toward the park's visitors. *Id.* 705 P.2d at 940–41. Thus, like the majority in this case, the Arizona Court of Appeals considered the size and condition of the land in determining the issue of duty and concluded that Arizona law did not impose the usual invitee standard of reasonable care in such circumstances.

On appeal, the Arizona Supreme Court reversed, rejecting the idea that the nature of the land had anything to do with the issue of duty:

> [S]uch reasoning is unpersuasive in the present context because the defendant invited and indeed encouraged David and others to come to a parcel of land specifically dedicated to extensive public use and enjoyment. The difficulties involved in taking steps directed toward the safety of the public in natural environments is certainly one factor to consider in determining whether the standard of care has been breached, but we cannot posit a rule of law that the state is relieved from all duty to those invited to use particular portions of public land, no matter what the hazard, simply because the state's parks are large and their terrain often inhospitable....

706 P.2d at 367.

Like the Arizona Court of Appeals, the majority in this case insists on taking into account the nature of the land to which Maher was invited in determining the duty he was owed. Just as the Court of Appeals attempted to create a special standard of care for wilderness areas, the majority attempts to create a special exception to rules for classifying visitors as invitees. However, the Arizona Supreme Court rebuffed the Court of Appeals' attempt to exempt the State from its duty of reasonable care. And not even the Court of Appeals was willing to go so far as to deny that the plaintiff was an invitee. Significantly, everyone in *Markowitz*—including the defendant and the Court of Appeals—agreed that the plaintiff was an invitee, even though the land was vast and untamed. *See* 705 P.2d at 939 ("There is no dispute that members of the public, including the injured plaintiff, were permitted freely to enter upon the lands and waters of Lake Havasu Park.... As such, there are classified as 'invitees' for purposes of tort law."); 706 P.2d at 367 ("The parties agree that David was an 'invitee' on state land.... That relationship imposes an obligation to take reasonable precautions for David's safety.").

In acknowledging that one encouraged to enter a public park is an invitee, despite the

size and natural state of the park, *Markowitz* is in accord with numerous other decisions that have considered visitors to state and federal parks to be invitees and have applied the general negligence standard of reasonable care to such cases.[2]

## II

The majority's attempts to sidestep the clear implications of *Markowitz* are unconvincing. First, the majority implies that *Markowitz*'s discussion of the relationship between the state of the environment and the standard of care is not good law because the state legislature subsequently enacted a recreational users statute that reduced the standard of care for recreational visitors. Opinion at 1042 n. 4. However, as the majority admits, this statute is irrelevant to Maher's claim to be a non-recreational invitee pursuing a mining claim. Furthermore, the statute cannot be read as overruling the Arizona Supreme Court's statement of the common law in *Markowitz*, since the statute was enacted *before Markowitz* was decided.[3] More importantly, there is no indication that in enacting the recreational user statute the legislature intended to overhaul the invitee-licensee case law outside the context of recreation. Instead, the legislature chose to carve out an exception to the common law for recreational use of land, leaving undisturbed the rest of the common law doctrine discussed in *Markowitz*.

Second, while the majority emphasizes the vastness of the public domain—which is clearly many times larger than the area at issue in *Markowitz*—this does not make *Markowitz* inapplicable to this case. Both cases involve a government entity opening up very large areas of public land in a way that indicates that "the public will not merely be tolerated, but is expected and desired to come." Restatement at § 332 cmt. d. The majority may think that *Markowitz* is distinguishable because while a 13,000 acre state park is very large, the public domain is very, *very* large and cannot possibly be subject to the same legal standard of care as the merely very large park at issue in *Markowitz*. However, I can think of no reason for subjecting a 13,000–acre park to a greater standard of care than the 725 million acres of public domain. At some point, large is large and the marginal increase in size is irrelevant to the question of whether it is appropriate to impose a duty of reasonable care upon the land's owner. Furthermore, as I shall discuss in more detail below, even if there were some precautions that were feasible in a 13,-000–acre park, but were impracticable in the larger public domain, the Arizona Supreme Court has indicated that this fact is taken into account in deciding what constitutes reasonable care *under the circumstances*, not in deciding whether the owner is absolved of the duty of reasonable care altogether. *Markowitz*, 706 P.2d at 367, 369.

Finally, the majority also attempts to distinguish *Markowitz* on the ground that the invitation in that case was to a "specific site," whereas the United States' invitation to Maher to explore the entire public domain was less "particular." Opinion at 1042–43 & n. 4. Thus, the majority states that the congressional inducement to enter the public domain

**2.** *See Harmon v. United States*, 532 F.2d 669, 671, 672 (9th Cir.1975) (treating whitewater rafters on Salmon River running through national forest as invitees); *Ashley v. United States*, 326 F.2d 499 (8th Cir.1964) (applying invitee standard of care to visitor to Yellowstone National Park); *Trowell v. United States*, 526 F.Supp. 1009, 1013 (M.D.Fla.1981) (holding that visitor to Alexander Springs Recreation Area was an invitee); *Henretig v. United States*, 490 F.Supp. 398, 403 (S.D.Fla.1980) (holding that hiker injured on unmaintained footpath in Yellowstone was an invitee); *Middaugh v. United States*, 293 F.Supp. 977, 980 (D.Wyo.1968) (holding that camper at Yellowstone was an invitee); *Adams v. United States*, 239 F.Supp. 503, 506 (E.D.Okla. 1965) (holding that visitor to Platt National Park

was invitee); *see also Mandel v. United States*, 793 F.2d 964, 968 (8th Cir.1986) (applying "reasonable care" standard, under Arkansas law, to diving injury in 60,000 acre national park containing the 130–mile–long Buffalo National River); *Miller v. United States*, 597 F.2d 614, 616–17 (7th Cir.1979) (applying "reasonable care" standard, under Illinois law, to diving injury in 7,000 acre lake in Crab Orchard National Wildlife Refuge).

**3.** The statute was enacted in 1983, while *Markowitz* was decided in 1985. *See* 1983 Ariz.Sess. Laws Ch. 82 § 1. The statute was not applied to that case, apparently because the accident occurred in 1975, prior to the statute's enactment. *See Markowitz*, 706 P.2d at 366.

does not count as an invitation because it lacks sufficient "geographic specificity" since it is not extended to a "discrete piece of property." *Id.* at 1042. While the principle upon which the majority relies is far from clear, it appears to be stating that although an effective invitation may be extended to very large parcels of land,[4] one may not be extended to *numerous* parcels of land, at least not through a general invitation. Thus, had Congress limited the mining laws to opening up the Rockhound Area to prospecting, the majority would apparently think Maher was an invitee. *See id.* at 1042 n. 4. Furthermore, had Congress issued separate invitations for each parcel of the public domain, including the Rockhound Area, I presume the majority would not hold each invitation ineffective simply because it was made in conjunction with numerous other specific and particular invitations. Thus, it appears that the fatal flaw in the congressional invitation here was that Congress used the shorthand term "public domain" rather than explicitly listing each piece of property it wished to encourage the public to enter and explore.

This is a novel proposition, created by the majority without any prompting from the parties or the Arizona courts. The opinion cites no policy rationale to explain why the Arizona courts would create such a "geographic specificity" rule, much less any cases actually employing this distinction. The only authority the majority cites to at all is the Restatement § 332 cmt. 1. This part of the Restatement, entitled "Scope of invitation," makes clear that "a visitor has the status of an invitee only while he is on the part of the land to which his invitation extends—or in other words, the part of the land which the possessor gives him reason to believe that his presence is desired for the purpose for which he has come." *Id.* But this requirement is of no importance to this case and does not support the notion that only invitations to discrete parcels of land can confer invitee status upon visitors. This passage of the

Restatement is concerned with the visitor's obedience to the limitations the land owner has placed on its invitation. So long as the geographic scope of the invitation is clear, there is no reason to think that a general invitation to visit a number of discrete parcels of land should be ineffective to confer invitee status upon those who respond to the invitation. Certainly the Restatement does not suggest otherwise.

The only plausible rationale for the majority's requirement is that a generalized invitation to enter a variety of separate parcels of land results in an invitation that covers a very large area of land over which the owner cannot effectively or economically exercise much control. Therefore, the majority may reason, such a broad invitation cannot operate as "an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and make them safe for [the public's] reception." Opinion at 1043 (quoting Restatement § 332 cmt. a). But this is just another way of saying that no one can ever be owed the invitee standard of reasonable care in a large wilderness area, precisely the assertion rejected by the Arizona Supreme Court in *Markowitz*. There, the Court made clear that the mere act of encouraging the public to enter a wilderness area operates as an implied representation that reasonable care had been taken. 706 P.2d at 367. Once such an inducement has been made, the owner incurs the duty of reasonable care whether such care has been exercised or not. Thus, the ability of the government to control a large natural environment has. no relevance to the duty imposed on the landowner who encourages the public to enter its lands, but rather is relevant to deciding what constitutes reasonable care under the circumstances:

> [T]he court of appeals assumes that any duty found to exist would necessarily be absolute, and would thus require the state to patrol the entire wilderness area of the state to discover and warn of all conceivable dangers, no matter how open and obvi-

---

4. The majority concedes that an invitation to visit a particular national park is an effective invitation, even though some national parks are very large and are left in a wilderness state. *See* Opinion at 1042–43. *See also* George C. Cog-

gins, Public Natural Resources Law § 2.03[2][b] (noting that Yellowstone National Park contains over 2 million acres); *Ashley v. United States,* 326 F.2d at 500 (affirming district court's holding that visitor to Yellowstone was an invitee).

ous the risk or how remote or inaccessible the area. Such an interpretation of the concept of duty is incorrect....

....

.... What is reasonable on the one hand or negligent on the other will depend on the circumstances—was the danger open and obvious, was it natural or artificial, was the park small or large, was the area often used or remote and unaccessible? Were precautions easy to take or difficult and expensive? All these are factors which determine the reasonableness of the defendant's conduct; they are questions of negligence, not duty.

*Id.* at 367, 369.

The requirement that the United States exercise reasonable care under the circumstances in the administration of its extensive landholdings is neither new nor radical. In fact, for more than a decade, the United States has owed a duty of reasonable care to every person entering the majority of its lands *regardless of invitee or licensee status.* Since the late 1970s, Alaska, Colorado, and California—which contain more than half of federal landholdings in the country[5]—have imposed a uniform duty of reasonable care under the circumstances on all landowners regardless of the status of the visitor. *See Webb v. Sitka,* 561 P.2d 731 (Alaska 1977); *Mile High Fence Co. v. Radovich,* 175 Colo. 537, 489 P.2d 308 (1971); *Rowland v. Christian,* 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561 (1968). This development has not resulted in catastrophic liability for the United States, nor has it led Congress to exempt itself from the tort law of these states. It is not unthinkable, therefore, that the Arizona courts would apply the invitee analysis in a straightforward manner and hold that the United States owed Maher a duty of reasonable care as an invitee.

Just what the duty of reasonable care under the circumstances required in this case is not at issue in this appeal. I may speculate, however, that it cannot possibly include maintenance of every access road in the Arizona public domain. Whether or not the road upon which Markowitz was injured was so well-traveled, and its unmaintained condition so concealed, that failure to post warning would be unreasonable, is another matter and one that should have been left for trial.

We are compelled to apply the law of Arizona to the facts of this case, treating the United States as a private person. The majority has misapplied Arizona law by creating a peculiar new twist in the invitee-licensee analysis that has no foundation in tort law and no function other than to treat the United States differently than other landowners in Arizona.

---

5. As the majority notes, over half of federal lands are located in Alaska. *See* Opinion at 1042 n. 3.